Syllabus.

# Richmond.

## BERTHA MUNDY V. COMMONWEALTH.

### January 14, 1926.

1. HOMICIDE—*Involuntary Manslaughter—Evidence held Insufficient to Sustain Conviction—Case at Bar.*—In the instant case, a prosecution for homicide, accused, a girl of seventeen, was found guilty of involuntary manslaughter. Accused testified that the pistol with which the killing was done was discharged unintentionally and if accused truly narrated the events leading up to the shooting, the homicide was an unavoidable accident. There was nothing in the evidence on behalf of the Commonwealth and no fair inferences to be drawn therefrom in conflict with the narrative of accused. The deceased on several occasions before his death, being fully conscious of his condition and of impending death, absolutely exonerated the accused from all blame. Accused in her narrative said that the pistol belonged to deceased. The father of deceased stated that his son had no pocket arms that he knew of, but witnesses for accused testified that deceased had a pistol.

   *Held:* That there was no evidence to support the verdict of involuntary manslaughter.

2. HOMICIDE—*Homicide Presumed to be Murder in the Second Degree—Burden of Proof to Reduce Degree of Homicide.*—The rule in Virginia is that every homicide is presumed in law to be murder in the second degree, and the burden is upon the accused to reduce it to manslaughter, voluntary or involuntary, or to show that the killing was justifiable or excusable, in the latter case—for example, an unavoidable accident.

3. HOMICIDE—*Involuntary Manslaughter—Definition.*—Involuntary manslaughter is the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act.

4. HOMICIDE—*Involuntary Manslaughter—Burden of Proof—Case at Bar.*—In the instant case, a prosecution for homicide, the jury concluded from all the evidence that the accused had successfully carried the burden to the point where she had shown that the homicide was involuntary—that is, that the killing was accidental—but committed in the prosecution of some unlawful, but not felonious, act, or in the improper performance of a lawful act. There was not a vestige of

20

evidence in the record to support the conclusion that accused was engaged in the prosecution of an unlawful act, not felonious, or in the improper performance of a lawful act.

*Held:* That the evidence did not sustain a verdict of guilty of involuntary manslaughter.

Error to a judgment of the Circuit Court of Buckingham county.

*Reversed and remanded.*

The opinion states the case.

*Hall & Rodgers,* for the plaintiff in error.

*John R. Saunders, Attorney General, Leon M. Bazile,* and *Lewis H. Machen, Assistant Attorneys General* for the Commonwealth.

CHICHESTER, J., delivered the opinion of the court.

Bertha Mundy, the plaintiff in error here, was in March, 1925, in the circuit Court of Buckingham county, indicted for the wilful, deliberate and premeditated killing of Napoleon West, with malice aforethought.

Upon a plea of "not guilty," a jury duly empaneled found her guilty of involuntary manslaughter and fixed her punishment at two years in the penitentiary. The trial court, after refusing to set aside the verdict upon motion of the accused, entered judgment upon the verdict and pronounced sentence accordingly.

Upon a writ of error and supersedeas duly granted, this judgment is before this court for review.

There are a number of assignments of error, but as we view the case it is only necessary to consider that involving the trial court's refusal to set aside the verdict as contrary to the law and the evidence.

Bertha Mundy, the accused, told the following story of the shooting:

"I am the accused in this case and became seventeen years old on the 25th day of last January, 1925. On the 8th of February, 1925, I left my home in Buckingham county, where I am living with my foster mother, Carrie Chambers, with whom I have been living ever since I was a very small girl, my father and mother are both dead, and I am an orphan. I went to visit a cousin of mine, one Horace Claiborne, who lives in Buckingham county, and after I got to Uncle Horace's house, my first cousin, Minnie Perkins, came there too, and we staid there together until the sun was about one hour high on said February 8, 1925, and then we left together, my cousin Minnie going to her home and I on my way to mine. We had gotten about one-quarter of a mile on our way when Napoleon West caught up with us riding a horse, and as soon as he caught up with us he got down off his horse and walked with Minnie for a little ways and then left Minnie and caught up with me, as I had gotten a little ahead of them. Then Napoleon and I walked along the road together until we got to the road where Minnie left, or turned off, for her home. I asked Minnie then if she wanted me to go home with her, but she said that she did not that she could go alone, and Minnie left us there and I saw no more of her on that day. Then Napoleon and I walked along the road together on my way home. He was leading his horse. We walked along the road until we got very near Dr. Bondurant's old place, where Mr. G. M. Shoemaker lives. Then Napoleon told me he wanted me 'to go in the woods with him,' but I returned him no answer at that time. Napoleon all this time was leading his horse. We kept walking along the road, and pretty soon he caught

hold of my hand and pulled me up against a wire fence on the side of the road. I asked Napoleon 'what was he trying to do, to pull me, horse and all through the wire fence,' and he said 'no, he was going to tie the horse.' I told him 'no, I don't reckon you are,' but he said 'yes, I is too.' Then Napoleon said, 'if you don't believe I am going to tie this horse and do what I say I am, you take this gun and shoot me.' He had his gun in the inside pocket of his coat and took it out and handed it to me, saying 'take this gun and shoot me,' and he then took the gun from the inside pocket of his coat and handed it to me with the barrel pointing towards him, the handle towards me. I took hold of the gun and no sooner than doing this it went off without any intention whatever on my part of shooting; then Napoleon fell; then I asked him if he was shot, and he said 'yes.' Then I started to cry, and he said Bertha no use to cry, as he was the cause of it all. He said he knew I did not mean to do it. Then I asked him what he wanted me to do for him, and he asked me to go to Mr. Shoemaker's for him and get Mr. Shoemaker to take him home, which I did. Before I left him in the road to go to Mr. Shoemaker's, I asked him what he wanted me to do with the gun, and asked him if he wanted it, and Napoleon said 'no, you keep it.' I took the gun with me and carried it by Mr. Shoemaker's house to Wm. H. Perkins and gave it to Cousin Bessie Goolsby, who kept it and gave it to Mr. H. E. Griffin, the sheriff.

"I then left Napoleon and went to Mr. Shoemaker's. I ran there with the pistol in my hand, and as soon as I got there I commenced calling for Mr. Shoemaker and he answered me. I told Mr. Shoemaker I had shot Napoleon West, and that Napoleon had asked me to tell him about it and get him to take Napoleon

home.   Mr. Shoemaker said he would see about it.
I then left Mr. Shoemaker's and ran over to Wm. H.
Perkins' house, which is about one-half a mile from
Mr. Shoemaker's, and Mr. Shoemaker's house is about
500 yards from where Napoleon was shot.   When I
got to Wm. H. Perkins' house, I saw Mr. Albert John-
son there and my cousin, Bessie Goolsby, and my
foster mother, Carrie Chambers.   I had the pistol in
my hand when I got there.   I had not let go of it, but
I then gave it to Bessie Goolsby, who kept it and gave
it to the sheriff.''

If the accused truly narrated the events leading up
to the shooting, the homicide was an unavoidable
accident.

[1] We find nothing in the evidence on behalf of the
Commonwealth, and we find no fair inference there-
from, in conflict with her narrative, and hence we find
no evidence to support the verdict of involuntary
manslaughter.

The witnesses on behalf of the Commonwealth,
Agnes West, a sister of deceased, Alonzo West, a
brother, and Thornton West, his father, knew nothing
of the circumstances attending the shooting, and
testified to nothing except that Napoleon told them
Bertha Mundy shot him, and the father stated that
his son had no pocket arms that he knew of.

Dr. T. E. Patterson, who attended the deceased
after he was shot, and had him sent to the hospital at
Charlottesville (where he later died) because he con-
sidered his wound serious, stated that the bullet en-
tered his hip through his left coat and hip pocket, but
he did not probe the wound and did not know what
direction the bullet took.   The clothing of deceased was
shown in evidence with the marks of the bullet in the
left pocket of the coat and the left hip pocket of the
trousers.

On behalf of the accused, the postmaster at Slate River Mills postoffice stated that the deceased had received a C. O. D. package containing a pistol in November, 1924, and that it looked like the pistol produced in evidence at the trial.

Tom Brown, another witness, stated that the Sunday Napoleon West was shot he came by witness' house and that he had a pistol in his inside coat pocket. He identified the pistol in evidence as the same one he saw in possession of the deceased at his house.

In addition to this, the deceased, not once, but on numerous occasions, and when he was fully conscious of his condition and of impending death, absolutely exonerated the accused from all blame. He stated to G. M. Shoemaker, to whom the accused first reported the shooting, and who carried him to his father's house, and while he was lying in the road immediately after being shot: "I am going to die, but it all came from my foolishness." To John Gough, on the Monday following the shooting, he said: "This is my last, I was shot through my own foolishness. I have no charge whatever to make against Bertha Mundy." To Albert Johnson, another witness, he said: "I am shot to death and have not another night to live on earth, but it all happened by my own foolishness and I am to blame."

This was all the evidence in the case, and we repeat that we see no evidence and no fair inference from the evidence upon which to rest a conviction of involuntary manslaughter.

[2, 3, 4] The rule in Virginia is that every homicide is presumed in law to be murder in the second degree, and the burden is upon the accused to reduce it to manslaughter, voluntary or involuntary, or to show that the killing was justifiable or excusable, in the

latter case—for example, an unavoidable accident. *Horton.v. Com'th*, 99 Va. 848, 38 S. E. 184; *Langley* v. *Commonwealth*, 99 Va. 807, 37 S. E. 339.

In the instant case, the jury concluded from all the evidence that the accused had successfully carried the burden to the point where she had shown that the homicide was involuntary—that is, that the killing was accidental—but committed in the prosecution of some unlawful, but not felonious, act, or in the improper performance of a lawful act.

"Involuntary manslaughter is the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act. 1 East P. C., ch. 12, sec. 1; 4 H. Comm. 192. See *Souther's Case*, 7 Gratt. (48 Va.) 673, 678; *Com.* v. *Jones*, 1 Leigh (28 Va.) 598, 610."

There is not a vestige of evidence in the record to support the conclusion that the accused was engaged in the prosecution of an unlawful act (not felonious), or in the improper performance of a lawful act. Her story of the shooting discloses an unavoidable accident, and one brought about solely by the conduct of the deceased himself. This is not a case where one carelessly and negligently, but without malice, discharged a gun towards a person, or on a public place or street, and killed one without any intention of doing so. This is a case where, taking into consideration all that had preceded the actual discharge of the pistol, deceased suddenly drew the pistol from his inside coat pocket, presented it to the accused with the barrel pointing toward him and the handle toward her. According to accused's statement, she seized the handle and the gun was discharged. It is a mere inference to hold that she killed the accused in the

prosecution of an unlawful act, or in the improper performance of a lawful act, and one not justified by the evidence. A fairer inference, from all the evidence in the case, if it is assumed that she shot intentionally, is that she shot in defense of her honor.

The contention is made in the brief on behalf of the Commonwealth that the defendant's account of the shooting is inconsistent with the physical fact that the bullet entered the body of the deceased through the left hand coat pocket and the left hand hip pocket. We do not think so. When asked the direct question how it happened that Napoleon was shot in the hip pocket, she answered: "It was the first time I ever shot a pistol—I don't know how it happened but Napoleon gave me the pistol and I shot him accidentally." Her narrative of the shooting is a complete, full and satisfactory answer to the question. She says, he first took her by the hand and pulled her and the horse up against the wire fence, and when she remonstrated with him, he said he was going to tie the horse. "Then Napoleon said, 'if you don't believe I am going to tie this horse and do what I say I am, you take this gun and shoot me.' He had his gun in the inside pocket of his coat and he took it out and handed it to me, saying, 'take this gun and shoot me,' and he then took the gun from the inside pocket of his coat and handed it to me with the barrel pointing towards him, the handle towards me. I took hold of the gun, and no sooner than doing this it went off without any intention whatever on my part of shooting, then Napoleon fell, then I asked him if he was shot."

The point at which the bullet entered the body of the deceased depended entirely upon what part of his body was next to the accused when the pistol was discharged. Manifestly, his left side was toward her at

the time. This is entirely consistent with the statement of the accused. Deceased was about to tie his horse but had not done so, and was holding him with his right hand. The pistol was on the inside pocket of his coat, and he took it out of that pocket, which was on the right side, with his left hand, and handed it to the accused. They were all close up against the wire fence, and the natural position for deceased to assume at the time, under the circumstances, was with his left side toward the accused. This is the reasonable explanation of the location of the wound, and so viewing the case, we think the location of the wound corroborates rather than contradicts her story; and we further think Bertha Mundy has not only met the burden of the presumption that the homicide was murder in the second degree, and overcome it, but that she has demonstrated satisfactorily the fact that it was a case of excusable homicide, and that she ought to have been found not guilty.

We are, therefore, of opinion to reverse the judgment of the trial court, and to remand the case to the Circuit Court of Buckingham county for a new trial, to be had in conformity with the views herein expressed.

*Reversed and remanded.*