# Richmond

HARVEY O. KIRK v. COMMONWEALTH OF VIRGINIA.

October 13, 1947.

Record No. 3220.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley and
Buchanan, JJ.

The opinion states the case.

*Vernoy B. Tate,* for the plaintiff in error.

*Abram P. Staples, Attorney General, M. Ray Doubles, Assistant Attorney General,* and *Ballard Baker,* for the Commonwealth.

*BUCHANAN, J., delivered the opinion of the court.

Kirk was indicted, along with three others, for the murder of his wife, Anna Kirk, whose death was caused by the bite of a snake alleged to have been held by Kirk during a church ceremony. He elected to be tried separately, was convicted by a jury of involuntary manslaughter and accordingly sentenced to two years in the penitentiary.

On this writ of error granted to that judgment, he has made 21 assignments of error, which may be gathered into three main contentions: (1) That the verdict was con-

*Note.—Because of circumstances beyond our control, it was necessary to reassign the writing of this opinion.

trary to the evidence; (2) that the court erred in giving and refusing instructions, mainly as to the crime of involuntary manslaughter; and (3) because some members of the jury were prejudiced against the defendant because of his religious belief.

The defendant was a preacher of a sect known as the Christian Church of God. His wife was also a member and a licensed preacher of the same church. As part of their religious ceremony they, and some members of the church, frequently handled poisonous snakes, supposedly as a test of faith, in the belief or on the theory that if the faith of the handler was adequate the snake would not bite him, or if it did, its bite would do no serious harm.

The indictment was in the short form for murder, authorized by section 4865 of the Code, but the Commonwealth furnished a bill of particulars setting forth the facts it expected to prove, and alleging in substance that the defendants committed murder by bringing a poisonous rattlesnake into the church and handing it to Mrs. Kirk with intent to kill her; or, having brought it into the church where there was a large crowd of people, the defendants were grossly negligent in handling it, and permitted it to bite Mrs. Kirk, causing her death. One of the errors assigned is that the court should have required the Commonwealth to furnish a more specific bill of particulars, but there is no merit in this assignment. The bill apprised the defendant of the details of the Commonwealth's case, and that it would ask a conviction for murder or manslaughter as the evidence justified. This the Code, section 4920, permits. The evidence supported no theory of murder and the instructions dealt only with involuntary manslaughter, of which the defendant was convicted.

The tragedy occurred at an annual meeting of the church held at Ramsey in Wise county, which had begun on August 31, and continued through September 2, 1945. The Kirks did not attend on the first night. One of Kirk's defenses was that he had nothing to do with calling or holding this meeting, but had called one for a dif-

ferent time and had not been consulted about the change, was not on the program and was no more than a visitor on the night of the trouble. However, he and his wife were present on Saturday night, September 1.

The room in which the meeting was held was 50′ x 24′ and fitted with benches. At the rear was a platform about 12 inches high, six feet deep and the same width as the church, at the front of which was a pulpit, and at the back of which were benches or seats, and on its left side facing the audience was a piano. Between the pulpit and the front benches was a space 12 or 13 feet wide in which the snakes were handled.

On this night the church was crowded and a number of people were seated on the platform, including Kirk and his wife, who sat near the piano about five feet back of the pulpit. They do not allow people up there "who are not in the faith," said one of the preachers.

After the preaching was over, one of the preachers announced there would be a "demonstration," or snake-handling service in front of the platform, and those who did not believe were told to stay back out of that space. The men who handled the snakes, which were about five in number and had been brought into the church in a box, put them down at the altar rail and those who were going to handle them were supposed to do so in front of the altar. "I never know who is going to handle them until they handle them," explained the preacher. The "demonstration" then began, consisting, apparently, of singing, shouting and handling the snakes.

As soon as the announcement was made about the snake-handling ceremony, Kirk went forward to the pulpit and stood there on its left with his right arm resting on it, and one foot on the rail running around the edge of the platform. While he stood there, one of the men jointly indicted with him presented a rattlesnake to him and he took it in his hands, with his left hand close to its head. About that time his wife came forward towards the snake. As a Commonwealth witness described it, she "raised up

shouting and she come shouting up toward him," and "she shouted right up to his left and she stood there shouting with her hands over this snake like that (indicating) and he held the snake—I couldn't tell when she was bit, anyway, he held it a few minutes (and) he let the snake go."

Mrs. Kirk was bitten by the snake three times, and as a result she died about four-thirty o'clock the following Monday afternoon, September 3. She declined medical aid, so her husband said. A doctor was called early Sunday morning, but to attend her for a miscarriage. She was five or six months pregnant and there was a premature birth, caused, the doctor said, by the snake bites. It was then too late to do anything for the snake bites, as he testified.

An additional tragic feature of the matter was that Mrs. Kirk was mentally ill. At the instance of the defendant she had been committed three times to the asylum at Marion. Her trouble was dementia praecox, 3 catatonic type. After each commitment she had been paroled to her husband against the advice of the hospital authorities. She was released to him May 23, 1944, on his signing a statement to the effect that he was taking her out against medical advice and assumed responsibility therefor. Her last release to him was in January preceding her death in September. A Commonwealth witness said she was like' a child.

There was a sharp conflict in the evidence as to the reason for Kirk's having possession of the snake and the time he held it. The evidence for the Commonwealth was to the effect that he was a willing recipient and held it for a time variously stated to be from a few seconds to ten minutes; that he could hear his wife shouting and knew she was approaching; and, in fact, looked at her and smiled before she patted the head of the snake, and that she stood beside him an appreciable time gesturing and shouting over the snake before she was bitten.

There was evidence by and for the defendant that the snake was forced upon him and he took it involuntarily;

that he held it only momentarily and disposed of it as soon as he could think what to do with it; that he did not see his wife coming up and did not know it was she gesturing over the snake's head, nor did he know she had been bitten until somebody told him afterwards.

The evidence thus presented a question for the jury, and in reaching their decision on the conflict it was, of course, important that they should be accurately and adequately instructed on the law of manslaughter. We do not think they were, and for that reason a more detailed discussion of the evidence and its weight is not appropriate.

The court properly instructed the jury that "while the law cannot interfere with a person's religious belief or opinion, this is no excuse for an illegal act made criminal by the law of the land, even though such act is based on conscientious religious belief."

As said by Chief Justice Waite in *Reynolds* v. *United States*, 98 U. S. 145, 25 L. Ed. 244, 250: "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. * * * * Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." See also, *Jones* v. *Opelika*, 316 U. S. 584, 62 S. Ct. 1231, 86 L. Ed. 1691.

We are concerned here only with the question of whether this defendant has been legally convicted by a jury who were properly instructed as to the nature and elements of the crime of which they found him guilty.

The court gave to the jury instruction P-17 in these words: "The Court instructs the jury that involuntary manslaughter is the unintentional killing of a human being, while performing a lawful act in an unlawful, careless, reckless or negligent manner; and is punishable by confinement in the penitentiary not less than one year nor more

than five years, or in the discretion of the jury, by a fine of not exceeding $1000.00, or confinement in jail not exceeding one year, or both."

It was objected to as an incorrect definition of involuntary manslaughter. The objection was well taken because the effect of the instruction was to tell the jury that the crime may be predicated not only on performing a lawful act in an unlawful or reckless manner, but that it might also consist of performing a lawful act in a careless or negligent manner.

In *Bell* v. *Commonwealth*, 170 Va. 597, 611, 195 S. E. 675, 681, are these very clear observations by Mr. Justice Spratley on the law of involuntary manslaughter:

"The courts and the authorities agree, in the absence of statutory regulations, that a higher degree of negligence is required to establish criminal negligence than to establish liability in a civil action. The negligence required in a criminal proceeding must be more than the lack of ordinary care and precaution. It must be something more than mere inadvertence or misadventure. It is a recklessness or indifference incompatible with a proper regard for human life. It must be shown that a homicide was not improbable under all of the facts existing at the time, and that the knowledge of such facts should have had an influence on the conduct of the offender. 99 A. L. R. 829; 5 Am. Jur. 927; *Cain* v. *State*, 55 Ga. App. 376, 190.S. E. 371." See also, 40 C. J. S., Homicide, sec. 62, p. 924; 26 Am. Jur., Homicide, sec. 210, p. 299.

In *Mundy* v. *Commonwealth*, 144 Va. 609, 615, 131 S. E. 242, 244, a definition was approved which described involuntary manslaughter as " 'the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act.' "

It was made clear in *Goodman* v. *Commonwealth*, 153 Va. 943, 151 S. E. 168, and in the *Bell Case, supra,* as well as in *Albert* v. *Commonwealth*, 181 Va. 894, 27 S. E. (2d) 177, that "improper" performance of a lawful act, in order

to constitute involuntary manslaughter, must amount to an unlawful performance of such lawful act, not merely a negligent performance; that is, the lawful act must have been done in a way so grossly negligent and culpable as to indicate an indifference to consequences or an absence of decent regard for human life. Negligence to support a conviction for crime must be at least criminal negligence. If it is extreme enough to be wanton and wicked, it may amount to murder.

"When recklessness of conduct causes another's death, it must in order to sustain a charge of involuntary manslaughter amount to unlawfulness of conduct. * * * * 'No person is guilty of involuntary manslaughter unless he kills another by acting unlawfully. It is immaterial whether the unlawful act which is an essential of involuntary manslaughter was unlawful in its inception as, *e. g.*, discharging a deadly weapon into a crowded street, or became unlawful after it was begun, as *e. g.*, driving a car in a public street and so accelerating its speed as to make it naturally tend to cause death or great bodily harm to persons in that street. The first example is of an inherently unlawful act; the second is of an act (driving a car) not unlawful in itself but done without due caution, *i. e.*, in an unlawful manner.'" *Commonwealth* v. *Aurick*, 342 Pa. 282, 19 A. (2d) 920, 922.

It is argued for the Commonwealth that if this instruction was error, it was cured by instruction P-19 given on motion of the Commonwealth, as follows:

"The Court instructs the jury that in determining whether a person is guilty of involuntary manslaughter it is not necessary to show that he intended to kill the person or that he had any malice; it is sufficient if the killing is accidental or contrary to the intention of the parties but is in the prosecution of some unlawful, but not felonious act, or in the improper performance of a lawful act. The crime is based on recklessness and a gross and culpable disregard of human life.

"The Court further instructs the jury that if the reckless-
ness and carelessness is committed under circumstances
reasonably calculated to result in injuries to others, this is
sufficient negligence to constitute the offense."

We do not think it may be safely said that this instruc-
tion cured the error. Its emphasis is that on a charge of
involuntary manslaughter the Commonwealth is not re-
quired to show intent or malice, and it repeats that it is es-
tablished if death results from doing an unlawful act, or from
the improper doing of a lawful act. The saving words that
the crime is based on recklessness and a gross and culpable
disregard of human life, are added rather incidentally to the
main thought, and the concluding paragraph of the instruc-
tion tends to obscure their importance.

The defendant was entitled to have it clearly expressed
to the jury that he was not to be convicted unless the Com-
monwealth had proved beyond a reasonable doubt that he
was guilty of criminal negligence. The indictment, sup-
plemented by the bill of particulars, charged that he had
caused his wife's death by being "grossly negligent in fail-
ing to keep said reptile confined." Instruction P-17 lowered
the standard of proof legally required to establish that
charge, and the jury were not adequately informed by any
other instruction of the nature and essential proof of the
offense.

There was still present in both instructions the state-
ment that the defendant might be convicted of involuntary
manslaughter if he caused his wife's death "in the prosecu-
tion of some unlawful act." The court refused to give in-
struction D-16 offered by the defendant, which would have
told the jury that "it is not a violation of the laws of the
Commonwealth of Virginia *per se* to handle a poisonous
serpent." It should have been given, following the giving of
instruction P-17, to guard against a conclusion by the jury
that having or holding the snake was in itself unlawful and
warranted a conviction of involuntary manslaughter. This

case arose before and was, therefore, unaffected by the enactment of chapter 23, Acts Extra Session 1947, p. 63.[2]

The charge against the defendant relied on by the Commonwealth to convict him of involuntary manslaughter was criminal negligence in handling the snake after it was released in the church, not in the act alone of having it in his hands. As stated, it requires proof of more than ordinary negligence to establish that charge. The defendant sought to have the jury so instructed by his instructions D-9, D-17, D-21 and D-22, which were refused.

Instruction D-9 was as follows: "The Court instructs the jury that if they entertain any reasonable doubt as to whether or not the defendant is guilty from the evidence beyond all reasonable doubt of gross, culpable negligence, they should acquit the defendant."

It correctly, if awkwardly, stated the Commonwealth's burden and it, or one stating that principle, should have been given. It is true that the court gave for the defendant five other instructions on the subjects of presumption of innocence and burden of proof (more than ample in that respect), but they were in general terms, and the jury were not in any instruction adequately and specifically informed as to the real issue in the case. The other three instructions, D-17, D-21 and D-22, contained inaccuracies in the legal principles they attempted to state and it was not error to refuse them.

It was also not error to refuse defendant's instructions D-23 and D-24. They sought to interpose a defense of contributory negligence on the part of the decedent, which had no place in the case. *Bell* v. *Commonwealth, supra.*

It was also not error to refuse defendant's instructions

---

[2] Be it enacted by the General Assembly of Virginia:

1. That it shall be unlawful for any person, or persons, to display, exhibit, handle or use any poisonous or dangerous snake or reptile in such a manner as to endanger the life or health of any person.

2. Any person violating the provisions of this act shall be guilty of a misdemeanor and punished by a fine of not less than fifty dollars nor more than one hundred and fifty dollars, or by confinement in jail not exceeding six months, or by both such fine and imprisonment.

D-11, D-12 and D-15. They were obviously improper and the rulings of the court as to them require no discussion.

For the errors in the instructions, as pointed out, the case must be reversed and a new trial granted. It is unnecessary, therefore, to deal with the assignments of error relating to jurors, as the questions will not arise on another trial.

*Reversed and remanded.*