# Staunton

## GROVER GRUBB v. COMMONWEALTH OF VIRGINIA.

September 7, 1949.

Record No. 3516.

Present, All the Justices.

The opinion states the case.

*Campbell & Campbell*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *H. T. Williams, Jr., Junior Attorney*, for the Commonwealth.

STAPLES, J., delivered the opinion of the court.

This writ of error brings before us for review a judgment of the Circuit Court of Wythe county, whereby the plaintiff in error (hereinafter referred to as the defendant) was sentenced to confinement in the State Penitentiary for a period of two years. The judgment was entered upon a verdict of a jury finding the defendant guilty of voluntary manslaughter in a trial upon an indictment for the first degree murder of James Whitley.

The defendant, Grover Grubb, is a native of Wythe county, 67 years of age, and afflicted with serious heart trouble. All his life he has been a farmer in that county. On October 19, 1947, he and about half a dozen members of his family were in the kitchen of his home when a dispute arose among several of them. His married daughter, Minnie Cox Taylor, was correcting her daughter Clara, and the two became involved in a scuffle. James Whitley, the deceased, came in between Mrs. Taylor and her daughter, apparently endeavoring to separate them. He caught hold of Mrs. Taylor's arms and they started tussling. Thereupon, the defendant, who had been sitting on a nail keg, stood up and pulled his pistol out of his pocket. He testified that his purpose was to stop the disturbance; that he took the pistol out of his pocket to use as a billy if they wouldn't stop fighting, and that he intended to hit either or both of them over the head with it if necessary to quiet them.

There is conflict in the testimony as to what happened immediately following this. Frank Cox, who was the only witness for the Commonwealth, testified that the defendant "raised up and pulled his pistol out of his hip pocket at the same time, and shot as soon as he got up," when the deceased was not closer than six or seven feet. He further testified that the deceased was a big strong man and taller than the defendant.

The defendant and other witnesses testified, however, that, when the deceased saw the defendant pull out his pistol, he immediately let loose of Mrs. Taylor and grabbed the defendant's hand in which he was holding it, and that a scuffle then ensued, during which the deceased was shot. There

is also evidence that the witness Frank Cox had left the room before the shot was fired.

The testimony will be discussed in more detail in considering the assignments of error.

The first error assigned is to the action of court in refusing to give any instruction on involuntary manslaughter. The reason given by the presiding judge for such refusal was thus stated:

"I am not going to give any instruction on involuntary manslaughter. Voluntary manslaughter will be the lowest offense as to which I will give an instruction. There is no evidence of involuntary manslaughter because the defendant was doing an unlawful act at the time of the shooting and there is no evidence of any accident. Defendant has testified positively that he was going to use his pistol as a billy. In my opinion this was an unlawful act and assault."

The defendant insists that, even though he was engaged in the commission of an *unlawful act* at the time of the shooting, yet there is evidence from which the jury could have concluded that the shooting was accidental, and he was entitled to have the jury instructed on involuntary manslaughter *unless such unlawful act was a felony*.

The Attorney General concedes the correctness of the above as a proposition of law (*Mundy* v. *Commonwealth*, 144 Va. 609, 131 S. E. 242), but contends that "under no view of the evidence could a verdict of involuntary manslaughter be reached," because "the defendant intended, and did attempt, a felonious attack upon James Whitley."

These conflicting contentions necessitate a review of the evidence relevant thereto.

It appears, without contradiction, that the deceased, James Whitley, was a nephew of defendant's wife; that his parents died when he was a babe in arms, and the defendant and his wife took care of him and raised him as a member of the family; that he was treated the same as the defendant's own children, and that defendant and the deceased, James Whitley, were fond of one another, and companions in

sports and amusements. There is no evidence of any ill feeling between the two prior to the time the shooting occurred, and the defendant testified that he customarily carried his pistol in his pocket. The testimony of the defendant, after stating that his daughter, Minnie, and her daughter, Clara, had engaged in a quarrel, in the course of which Minnie smacked Clara, continues as follows:

"When she did this James" (the deceased) "came in from the other room and grabbed hold of Minnie and had her in the hair. I had been sitting down and I got up and thought I would stop the ruckus. I had my pistol in my pocket and as I got up I took it out of my pocket and intended to use it as a billy if they wouldn't stop fighting. I took a step towards James and Minnie and James let loose of Minnie and came at me. He grabbed my hand that had the pistol in it and pushed it up above my head and while it was up that way the gun went off. I didn't intend to shoot and I didn't know when the gun went off that I had shot James. When I got up I took my pistol out of my pocket and was holding it down at the side when James came at me and grabbed the pistol. My right hand had the pistol by the grip and when James grabbed hold of the pistol he grabbed over the cylinder and I caught the barrel of the pistol with my left hand and we were struggling with the pistol in that position when it went off. We were scuffling right by the door going from the kitchen into the bed room and he had pushed me back to this step and I was falling backwards with my hands up over my head, still holding the pistol, and James had hold of the pistol too, and it went off while I was in that position. I didn't intend to fire it, and I had not intended to shoot James with it. I had only intended to use it as a billy. James fell, but got up and followed me on in the bed room and grabbed hold of me again. I still didn't know he was shot. I got lose from him in the bed room and went out the front door, out into the yard. I didn't know James had been shot until later on when the ambulance came."

On cross-examination, the defendant testified that he might

have hit them with the barrel or the butt of the pistol if the deceased and Minnie had not stopped their struggle.

The foregoing testimony of the defendant as to the circumstances under which the pistol was fired, as well as his friendly relations with the deceased, is corroborated by the testimony of defendant's daughter, Minnie Cox Taylor, and his wife, Mrs. Grubbs.

G. C. Steffey, the undertaker who prepared the body of the deceased for burial, testified that the bullet wound entered the deceased's left chest, about the second rib, and ranged downward and came out just below the last rib on the right side. He also said there was a blue spot on one arm, and there were fresh cuts on the fingers on the right-hand but there were no powder burns.

Muncey Sutherland, the sheriff, and his deputy both testified that they noticed a place on defendant Grubb's hand which looked like it was burnt and hurt.

We do not think the foregoing evidence as to the circumstances under which the shooting occurred compelled a finding by the jury that the defendant, at the time, was engaged in making a felonious assault upon the deceased. The jury may well have thought that the defendant felt it incumbent upon him to maintain discipline and order in his own home, and that, being a man of the age of 67 years, in bad health, and suffering from heart trouble which prevented violent exercise or heavy work, the display of the pistol would be sufficient to accomplish the desired purpose. The defendant's testimony was to the effect that he did not intend to use the pistol at all, even as a billy, unless it was necessary to quiet the disturbance.

The jury might also have concluded that, without any intention on the part of the defendant to fire the pistol, it was accidentally discharged in the scuffle. The fact that the bullet pursued a course extremely downward might have been thought by the jury to be a corroboration of the defendant's statement that his hands were higher than his head when the shot was fired.

On the whole we think it was a question for the jury

whether the defendant, at the time of the shooting, was engaged either in a felonious assault, or an attempted felonious assault, upon the deceased, and also whether the shooting was accidental. It was therefore prejudicial error to refuse to instruct the jury on involuntary manslaughter. If the evidence is substantially the same at a new trial, the jury should be instructed as to what constitutes a felonious assault under the laws of Virginia, and also that, if it believes that there was no felonious assault, or attempted felonious assault, upon the deceased, and that the shooting of the pistol was not intended by the defendant but was accidental, he could be found guilty of no higher offense than involuntary manslaughter.

The defendant assigns as error the giving of various instructions dealing with the presumption of second degree murder, with malice, and other elements of the crime of murder in the first or second degree. Since the judgment complained of must be reversed and a new trial granted because of the refusal of the court to instruct the jury upon the question of involuntary manslaughter, the questions raised with reference to these instructions become immaterial. On a new trial, the accused cannot be tried for any higher offense than voluntary manslaughter, and the provisions complained of in the instructions would not apply.

Section 4918 of the Code of Virginia provides:

"If the verdict be set aside and a new trial granted the accused, he shall not be tried for any higher offense than that of which he was convicted on the last trial."

See *Bevley* v. *Commonwealth*, 185 Va. 210, 38 S. E. (2d) 331.

Error is also assigned to the action of the court in permitting the Commonwealth to prove that a short time after the shooting the defendant, while he was out in the yard of his home, fired four shots from his pistol into the tops of some trees.

The Attorney General argues that the evidence was proper and relies upon the following statement of the rule in 22 C. J. S., at page 954:

"At least in so far as they tend to connect him with the crime and are not merely self-serving, and are inconsistent with a theory of innocence, and tend to show consciousness of guilt, the conduct and general demeanor of accused after the crime, his language, oral and written, his attitude and relations toward the crime, and his actions in the presence of those engaged in endeavoring to detect the criminal are always relevant, whether part of the *res gestae* or not, provided they are not so remote in time or extend over so long a period as to create a strong probability that they are the outcome of other motives than a consciousness of guilt. * * *"

The Attorney General insists that this evidence was properly admitted as "tending to show the mental attitude of the defendant at the time of the homicide."

█ While this testimony would unquestionably be admissible, if it had any relevancy to any fact in issue, we do not think it has under the circumstances of this case. The only probative value of the testimony is to show that the defendant was in a highly nervous and excited condition *after* the struggle and shooting of the pistol. It is not a justifiable inference therefrom that the defendant intended to shoot the deceased. The defendant is an old man suffering from serious heart trouble. Such a state of nervousness and excitement might just as well have been produced by his physical encounter with the deceased, accompanied by an accidental shooting, as would be the case if the shooting was intentional. The evidence does not tend to show the state of mind of the defendant at the time of the shooting, but only what it was afterwards. In other words, the state of mind shown was the *result*, not the *cause*, of the shooting. On another trial we think the evidence should be excluded.

The defendant also complains of the action of the trial court in sustaining the Commonwealth's objection to an argument of his counsel. In addressing the jury, defendant's counsel said:

" 'The Court has instructed you that in determining the

credibility of the witnesses you are to consider their interest, if any, in the outcome of the litigation. You gentlemen saw Mrs. Grubb and saw her pathetic condition. She is vitally interested in the outcome of this case, and that is a fact for you to consider in weighing her evidence; but I submit to you that notwithstanding that interest, and we admit that it is great because as she sits there waiting the word as to your verdict'—

"Thereupon the Attorney for the Commonwealth objected on the ground that counsel for the defendant was appealing to the sympathies of the jury, and that such an appeal should not be made.

"The Court sustained the objection, saying:

" 'The jury saw Mrs. Grubb's condition and it is pathetic. That is enough to say about that. Argue the case and don't call any further attention to Mrs. Grubb's condition.' "

There was no reversible error in the ruling. Generally speaking, the extent to which counsel for the defendant in a criminal case may appeal to the sympathies of the jury in behalf of his client lies within the sound discretion of the presiding judge. While a reasonable latitude for argument should be allowed counsel for accused in arguing his client's case, it should also be borne in mind that facts which cannot be proved, because irrelevant, afford no proper basis for argument. *Parsons* v. *Commonwealth*, 138 Va. 764, 121 S. E. 68.

The application of this rule is to be left to the sound discretion of the trial court, subject to review for prejudice to the accused.

The judgment complained of must be reversed and the case remanded for a new trial.

*Reversed and remanded.*