## Richmond

CHARLES GEORGE BECK v. COMMONWEALTH OF VIRGINIA.

June 13, 1975.

Record No. 740306.

Present, All the Justices.

*William D. Dolan, III*, for plaintiff in error.

*Wilburn C. Dibling, Jr., Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

Per Curiam.

Sitting without a jury, the trial court convicted Charles George Beck of two counts of involuntary manslaughter and, on each count, sentenced him to five years in the penitentiary, with all but six months suspended. The two sentences were fixed to run concurrently.

We must decide whether the evidence was sufficient to establish the *corpus delicti.*

Under familiar principles, we view the evidence in the light most favorable to the Commonwealth. Between the hours of 7:00 p.m. and 11:30 p.m. on February 23, 1973, Beck consumed "around seven" beers at the Park Inn Restaurant where he was a regular customer. When he arose from his table to leave, he appeared to be "a little unsteady." As he went out the door, "he sort of hung his heel" on a step "and stumbled and caught himself". As he drove away, "his door flew open and he leaned out his car door and pulled it shut and drove on." Proceeding to his home some three blocks away, he drove east on Old Centerville Road. Travelling east, the paved portion of the road, which is 28 feet wide, is bordered on the right by a narrow shoulder and drainage ditch. On the left side are houses and the road is curbed and guttered against residential lawns. There were no street lights on the right side of the road, but there were "street lights on the side of the houses."

Leaving a dance just before midnight, Raymond Simpson, age 16, Bobby Moore, age 11, Gary Mitchell, age 17, and Craig Moore, age 13, were walking east along the right side of the road. Simpson was about two feet ahead of Bobby Moore. Mitchell was walking in the ditch abreast of Simpson. Craig Moore was walking in the open field some 15 feet from his companions. Donald Shifflett and two of his friends, who had also attended the dance, were walking east along the left side of the road.

Craig Moore testified that he looked back and "seen some car lights coming over the hill . . . so I turned my head and kept on walking and then I seen a car hit" Bobby Moore and Raymond Simpson who were walking in the gravel "off the paved portion"; and that the brake lights came on, the car slowed down, the right

door came open, the dome light came on, the car went into the ditch, the dome light went off, and without stopping, the car came out of the ditch and drove away "at a fast rate of speed". One victim "was laying up on top and one was laying down the road from him." Both died of their injuries.

Gary Mitchell testified that Bobby Moore and Raymond Simpson were not walking on the road but "on the side"; that when the car struck the boys, something hit his leg which he later assumed was Simpson's body; that the car then travelled about 20 feet with the brake lights on; that he saw the "headlights shining on Raymond [Simpson]" who was then "on his knees"; that the "car swerved over to the right and the car door opened and knocked him down;" and that he saw "a guy on the right side laying down in the car when the door opened."

Donald Shifflett testified that after he "heard this thump noise", he looked across the street where one of the victims was lying and saw the car go "down the road a little ways and it sort of looked like he pulled over and hit his brake lights and then went on."

About 2:45 a.m. on February 24, 1973, investigating officers examined Beck's 1971 Impala Chevrolet parked in his driveway. They found damage to the right front extending beyond the fender and headlights to the grill, "two large dents in the right front hood", and "a substantial amount of grass and mud imbedded in the rim of the tire." Material recovered from the fender proved to be clothing fibers. One of the officers testified that, when asked about the damage to his car, Beck "stated he had struck a dog. At this time Sergeant Harris said, 'You mean you struck a dog and didn't bother about stopping?' and Mr. Beck stated, 'Well, I don't know what I struck, it was a blur.' " At this point, "Mr. Beck stated he didn't wish to answer any more questions without consulting a lawyer. . . ."

Beck testified that, during the four to four and one-half hours he had been in the restaurant, he had drunk only "four or five" beers; that he did not stumble on the step; that "several times" he had experienced trouble keeping his car door closed; that he was travelling 30 to 35 m.p.h. on Old Centerville Road when he "heard a thump on the front of my car and I pulled over, put on the brakes, stopped, opened my door, looked back, assuming I had struck a dog. I heard no noise from a dog. I closed my door and proceeded home"; that before he heard the "thump" he never left the travelled portion of the roadway; and that during his trip home, he never saw anyone

walking on either side of the road. Beck said that he did not examine his car for damage until after he was arrested. Asked whether he told the officer "it was a blur", he testified: "I'm not saying I didn't say that. I don't remember telling the officer that . . .", and "[i]f I said a blur, I meant to say a dog."

> " 'Involuntary manslaughter is the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act. [Citations omitted].' " *Mundy* v. *Commonwealth*, 144 Va. 609, 615, 131 S.E. 242, 244 (1926).

*See also, Lewis* v. *Commonwealth*, 211 Va. 684, 686, 179 S.E.2d 506, 508 (1971); *Fadely* v. *Commonwealth*, 208 Va. 198, 202, 156 S.E.2d 773, 776 (1967).

When the Commonwealth predicates the charge upon the violation of a statute, it must "show that such violation was the proximate cause of the homicide". *Goodman* v. *Commonwealth*, 153 Va. 943, 951, 151 S.E. 168, 170 (1930). When the Commonwealth predicates the charge upon an improper performance of a lawful act, it must show that the performance was so improper as to constitute negligence "so gross and culpable as to indicate a callous disregard of human life", 153 Va. at 952, 151 S.E. at 171, but the negligence need " 'not be so gross as to raise the presumption of malice' ". 153 Va. at 946, 151 S.E. at 169.

■ We believe that the evidence was sufficient to support a finding that the defendant was guilty of the misdemeanor of driving a motor vehicle while under the influence of intoxicants in violation of Code § 18.1-54 (Repl. Vol. 1960) and that such violation was the proximate cause of the two homicides. The defendant ingested "around seven" beers during a period of less than five hours preceding the tragedy, a quantity and time interval sufficient to raise an inference of intoxication. That inference is reinforced by the evidence of defendant's subsequent behavior. Within minutes before the tragedy, he was so unsteady on his feet that he tripped on a step in a doorway with which he was fully familiar, stumbled, and almost fell. As he drove away, he had to close the car door on the driver's side a second time, and apparently, he left the opposite door partly ajar. Notwithstanding the facts that the headlights on his late model car were shining on objects ahead, that there were lights on the left side of the

road, and that there were no lights from oncoming traffic to distract his attention, he failed to see three young men on his left and four on his right; all he remembers seeing "was a blur". While the defendant testified that after he realized he had struck something, he pulled over, stopped, opened his door, and listened, all of the eyewitness testimony showed that he did not stop but drove away "at a fast rate of speed". Even if the defendant sincerely believed that what he had struck was a dog, his hasty departure tends to show a reluctance to remain on the scene where his sobriety might be challenged by an investigating officer. Finally, when the defendant arrived at home, he parked his car in his driveway and entered the house without pausing to examine his car for damage. In their cumulative significance, such circumstances were sufficient to support a finding that the defendant violated Code § 18.1-54.

The evidence was also sufficient to support a finding that such violation was the proximate cause of the homicides. Except for the defendant's own testimony that his car never left the paved portion of the road until after he heard the impact, the unanimous eyewitness testimony showed that both victims were on the shoulder when they were struck. Absent evidence of any other cause for the car leaving the pavement, the only reasonable inference is that the proximate cause was the driver's impaired perception, retarded reflexes, and disrupted motor coordination resulting from the quantity of alcohol he had so recently consumed.

Even when the evidence shows a level of intoxication lower than that necessary to a conviction for violation of Code § 18.1-54, such evidence is germane to the question of criminal negligence. More precisely, the degree of intoxication is a circumstance relevant to a determination of the question whether, in light of all other circumstances, the act of driving an automobile was such an "improper performance of a lawful act" as to constitute negligence "so gross and culpable as to indicate a callous disregard of human life". But because the evidence was sufficient to show that the defendant was guilty of a violation of Code § 18.1-54, and that this was the proximate cause of the homicide, we need not decide that question.

*Affirmed.*