### Richmond

## HOWARD RICHARD GOODEN

### V.

## COMMONWEALTH OF VIRGINIA

Record No. 822046.

January 20, 1984.

Present: All the Justices.

*Halford I. Hayes (J. Randolph Smith; Layne, Hayes, Smith & Gonet,* on brief), for appellant.

*Roscoe C. Roberts, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

Howard Richard Gooden was found guilty in a bench trial of involuntary manslaughter. He was sentenced to six months in jail and ordered to pay a fine of $1,000.00. Execution of the sentence was suspended upon condition defendant pay the fine and not hunt with a firearm or have a firearm in his possession under any circumstances for five years. The issue on appeal is whether the evidence is sufficient to support the August 1982 judgment of conviction.

The facts basically are undisputed, although they are susceptible to conflicting inferences. Applying settled principles, we will

state the evidence in the light most favorable to the Commonwealth, the party prevailing below.

On November 16, 1981, the first day of hunting season, the victim, James Everette Wyant, and his 13-year-old brother-in-law, Robert Eugene Sipe, were hunting deer in Rockingham County. Near 5:00 p.m., they were standing together "on top of a knoll" in the "clear" upon a north-south power line easement, which runs generally parallel to and one-half mile east of Route 340. There was no precipitation, but "it was getting close to dark."

Sipe and the victim were facing west, Sipe being two or three feet to Wyant's right side. Sipe was wearing an orange hat and coat. Wyant wore a red hat and red bandannas pinned to the front and back of his jacket.

Suddenly, as Wyant looked "over into the thickets," thinking he heard a deer, he was shot and fell to the ground. According to Sipe, Wyant "hollered, 'Don't shoot no more,' " as he went to his knees and "just laid down." Sipe testified he heard "about five" shots, two or three before Wyant yelled and two after the shout. One of the last shots "went past" Sipe's ear. Sipe answered "no" to a question by the trial court whether he saw "any deer anywhere close to" him in the minute or so before the firing or while he was hearing the shots.

When the firing began, Sipe dropped to the ground, where he remained for "a couple minutes" to determine "if they'd quit shooting." Sipe stood up and immediately sought help, shouting, "Somebody shot my buddy." He ran in the direction of Larry Shiflett, who was about 175 yards south of where the victim fell and to the east of the right-of-way.

Shiflett had been hunting in the area during that afternoon with two brothers. He had observed "too many" hunters along the easement and told his brothers to "get off the power line here a little bit," fearing "somebody might get shot." After Shiflett moved away from the easement and had been "sitting there maybe a half an hour," he heard Sipe shouting. Shiflett and Sipe ran back to Wyant. Shiflett determined "there was no pulse" and that Wyant was dead.

Wyant died from a single bullet wound. The fatal shot entered the right upper chest, travelling from right to left backward without significant upward or downward deviation. The shell exited at the posterior aspect of the left upper arm, lodging between the undershirt and the skin.

After Shiflett determined Wyant was dead, he and Sipe observed two unidentified individuals "take off and start running" from a position in a "hollow" along the power-line easement. This position was approximately 390 yards north of and downhill from the point where Wyant fell. Shiflett observed the individuals move first in a northerly direction. Next, they turned and moved south toward where Shiflett and Sipe were standing. Fearing "trouble," Shiflett and Sipe left the area in the opposite direction and reported the incident to police.

The Sheriff of Rockingham County arrived at the scene near 6:00 p.m. and found Wyant's body where he had fallen on the knoll, "right on the edge of a trail" that the Sheriff considered to be the power company's right-of-way.

Two days after the incident, Detective Daniel Comer of the Rockingham County Sheriff's Department interviewed the defendant twice in Chesterfield County. Defendant, a resident of Chesterfield County but a native of Rockingham County, had been hunting on the day in question in the area where Wyant was shot. Comer "believed that either [defendant] or someone in his hunting party may have known something about the death of the victim."

During the first interview, conducted in the morning at the Chesterfield Police Department in the presence of defendant's attorney, defendant indicated he had been hunting during the afternoon in question along the right-of-way with his brother-in-law. Evidence presented by defendant at the trial showed defendant was downhill and north of the victim's position, at a distance of approximately 636 yards. According to the officer, defendant stated "he had seen a deer cross the Vepco right-of-way, the cleared right-of-way, about a hundred yards south of where he was standing sometime before 5:00 P.M., and that he had shot at the deer with a rifle." Defendant told Comer the rifle was a .30-caliber carbine.

During the second interview, conducted in the afternoon in the office of Gooden's attorney, defendant revealed that when he "fired at the deer that he saw crossing the right-of-way, that he had actually been carrying and had fired two different rifles." Defendant stated "he was about fifty yards west of the — or generally west of the right-of-way in the brushy area when he fired at the deer." He told Comer he was carrying a lever-action rifle and fired at the deer once with that weapon. Defendant said "he

dropped that . . . rifle, and shot at the deer additionally three or four times with the thirty caliber carbine." Defendant stated "he felt that he had not hit the deer and that he did not know that he had hit anything."

During the second interview, defendant surrendered the lever-action weapon, a Marlin .30-.30 Winchester rifle. Defendant had delivered the other rifle to a Chesterfield detective on the day after the shooting. Comer also obtained possession of that weapon, a U.S. Military, auto-loading, .30-caliber, M1 carbine. Defendant explained to Comer that he initially did not volunteer information about two weapons because he was afraid he had violated the hunting laws by use of more than one rifle.

According to subsequent laboratory analysis, the bullet that killed Wyant was fired from the .30-.30 Winchester.

Within a week of the homicide, four shell casings were found "very close together" and "a couple of feet" from the right-of-way. They were located approximately 430 yards north of the point where Wyant was shot. Laboratory analysis revealed that the shells had been fired in defendant's M1 carbine.

At trial, defendant presented the testimony of Gary A. Judd, a Harrisonburg surveyor. Defendant had accompanied the surveyor to the scene and pointed out where he had been standing as he shot at the deer. Judd had been advised of the place where the victim's body was found.

From a plat drawn by Judd, as well as from aerial and ground-level police photographs of the entire scene, the following facts appear. The pertinent area of the right-of-way follows a straight line and is approximately 60 feet wide. Photos taken six days after the incident show the easement to be relatively clear of high brush on both sides of utility poles that stand in the center of the right-of-way.

The plat contains a profile of the land. The terrain southwardly, from the point where defendant told Judd he was standing when he shot, slopes gradually downhill for about 140 yards to a stream. The land becomes level for about 220 more yards and then rises 20 feet vertically on the south side of a gully, continuing gradually uphill for approximately 276 yards to the point where Wyant was shot. According to the survey, the difference in elevation between the points where defendant and Wyant were standing was 41.9 feet. The plat shows that defendant told the surveyor he shot at the deer from a point on the western edge of the right-of-way as

the deer was on the eastern edge, approximately 70 yards south of defendant.

At the May 1982 trial, defendant, age 40, testified he had hunted regularly for 25 to 30 years. He stated that on the day in question at about 4:00 p.m., he went to the right-of-way with a hunting companion because it was "pretty much" a popular place to hunt. The pair had entered the area by truck from Route 340 along a dirt road. Defendant observed approximately 10 or 15 vehicles, apparently belonging to hunters, as he moved to the right-of-way. The companion went in a northerly direction and defendant proceeded to the point illustrated on the plat.

Defendant testified he "had no more and got there . . . on the edge of the power line" when he saw a deer "coming out" onto the right-of-way approximately 75 yards to the south. He stated that he shot once with the .30-.30 lever-action Winchester diagonally across the easement. The deer "took off," moving east to west. He said that he laid the gun down, took the M1 carbine, and shot approximately three or four times "at the deer when he run through here." Testifying all the shooting took place in 15 or 20 seconds, defendant said he walked a short distance looking for the deer. Defendant stated that because the hour was late, he then proceeded to his truck, still looking along the way for the deer. When he arrived at the truck, parked about 200 yards from the power line, defendant met his companion and they left the area. Defendant testified he was "on" the right-of-way about "ten or fifteen minutes."

On cross-examination, when asked to explain his statement to Detective Comer that he was 50 yards west of the easement when he fired, defendant answered he was "guessing" at that earlier time. He testified that "since then I went back to the area and I found it was more like fifty feet rather than fifty yards." When reminded that he just had testified he was on the "edge of the power line" when he began shooting, defendant denied saying "edge" and stated that he was "back into the brush just a little." He said he actually was "counting" from the power line and that he was positioned 50 feet from the line of the power poles. Finally, on re-direct examination, defendant testified there was "no way" he could know "for sure" his exact location when he shot.

The trial court decided the defendant's version of the tragedy was "incredible" and found the Commonwealth had established beyond a reasonable doubt that Gooden was guilty of criminal

negligence. Concluding the defendant shot "blindly" and failed to exercise slight care to ascertain that he could fire his weapons safely, the court found that the defendant demonstrated a callous disregard for the life of other persons who were in the woods on the day in question.

Involuntary manslaughter is defined as the accidental killing of a person, contrary to the intention of the parties, during the prosecution of an unlawful, but not felonious, act, or during the improper performance of some lawful act. *Beck* v. *Commonwealth,* 216 Va. 1, 4, 216 S.E.2d 8, 9-10 (1975); *Mundy* v. *Commonwealth,* 144 Va. 609, 615, 131 S.E. 242, 244 (1926). The "improper" performance of the lawful act, to constitute involuntary manslaughter, must amount to an unlawful commission of such lawful act, not merely a negligent performance. The negligence must be criminal negligence. *Kirk* v. *Commonwealth,* 186 Va. 839, 847, 44 S.E.2d 409, 413 (1947). The accidental killing must be the proximate result of a lawful act performed in a manner "so gross, wanton, and culpable as to show a reckless disregard of human life." *King* v. *Commonwealth,* 217 Va. 601, 607, 231 S.E.2d 312, 316 (1977). *See Bell* v. *Commonwealth,* 170 Va. 597, 611-12, 195 S.E. 675, 681 (1938).

Stated differently, reckless conduct must amount to unlawful conduct in order to sustain a charge of involuntary manslaughter. And it is immaterial whether the unlawful act was unlawful in its inception, that is, an inherently unlawful act, such as discharging a deadly weapon into a crowded street, or became unlawful after it was begun, such as lawfully operating a vehicle in a public street but so accelerating its speed that it may cause death or serious bodily harm to persons in that street. *Kirk* v. *Commonwealth,* 186 Va. at 847, 44 S.E.2d at 413. The present case is of the second category; conduct not inherently unlawful, but done without requisite caution, in an unlawful manner.

Defendant contends the trial court found him guilty by imposing erroneously a standard of strict liability. Conceding the court properly could disregard his testimony of firing at a deer 75 yards away, defendant argues there was, nonetheless, no evidence of actions by him that would support a finding of criminal negligence, unless the court relied improperly on a theory of strict liability. We disagree.

On appeal of a conviction, we must not only view the evidence in the light most favorable to the Commonwealth, but we

must accord to the evidence all reasonable inferences fairly deducible therefrom. *Evans* v. *Commonwealth,* 215 Va. 609, 612, 212 S.E.2d 268, 271 (1975). In addition, the judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict; it will not be disturbed on appeal unless plainly wrong or without evidence to support it. *Id.* at 613, 212 S.E.2d at 271. We hold the evidence, with all reasonable inferences properly drawn from the evidence, supports the conclusion of the trial court.

As the trial judge aptly stated, defendant's account of the incident is "incredible;" the event could not have occurred in the manner described by the accused. The evidence is undisputed that the victim was killed by a bullet from defendant's gun. That fact, of course, places defendant at the scene of the crime at the time in question. Yet the defendant, in effect, alleges that he shot at a deer, claimed to be 75 yards away, and that he mistakenly struck the victim, who was at a point 636 yards to the south. But the defendant's evidence shows that he was shooting downgrade, at an angle undisclosed by the evidence. Manifestly, a bullet from a weapon aimed downhill would not have hit an object that was elevated, according to the evidence, 41.9 feet above the horizontal at an angle of 27 degrees.

Discarding defendant's testimony about the manner in which he shot, we must examine the evidence remaining, cognizant of the uncontradicted fact that defendant fired the fatal bullet. The record shows that defendant, a hunter of considerable experience, entered the area in question on a day when he knew there were a number of other persons in the immediate vicinity; there were "too many" hunters along the right-of-way. The visibility was reduced due to the time of day. The victim was wearing bright-colored garments and was next to a companion similarly dressed.

Whether defendant was standing 636 yards from the victim, as he contends, or whether he was about 390 yards from Wyant, where Shiflett and Sipe observed the two unidentified persons, is unimportant. Parenthetically, the evidence indicates that if defendant was positioned where the four shell cases were found, a horizontal shot south from that point probably would have hit the steep bank of the gulley. Important, however, is that defendant, from a point on or immediately adjacent to the unobstructed easement, fired a weapon capable of inflicting serious bodily harm or death directly at two persons who were likewise standing in the right-of-way. This is not a case of a hunter who made an identifi-

cation of game, fired, and because of poor aim struck a human being. Given defendant's incredible testimony, such a theory is eliminated by Sipe's testimony that he saw no deer "anywhere close to" the victim either immediately before the shots were fired or during the shooting. Nor is this a case of mistaken identity in which a hunter, exercising due caution, shot at a human, thinking the human was an animal.

In this case, the defendant either failed to look, or if he looked, he failed to do so with requisite caution within the distance he should have known was the range of the weapon he was discharging. Together, the failure to identify adequately and the subsequent shooting constitute the reckless and unlawful conduct. The act of hunting was not inherently unlawful; rather the shooting was an improper performance of a lawful act. Reasonably inferred from all the circumstances is that defendant fired blindly and wildly from a position on the easement, perhaps at movement or a flash of color on the knoll, in utter disregard of the safety of others.

Accordingly, we cannot say that the trial court's finding of conduct so gross, wanton, and culpable as to show a reckless disregard of human life was plainly wrong or without evidence to support it. Thus, the judgment of conviction will be

*Affirmed.*

COCHRAN, J., dissenting.

The judgment of the trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be disturbed unless it is plainly wrong or without evidence to support it. *King* v. *Commonwealth,* 217 Va. 601, 604, 231 S.E.2d 315 (1977). Nevertheless, in my view, the finding of the trial court that Gooden's conduct was so gross, wanton, and culpable as to show a reckless disregard to human life was plainly wrong or without evidence to support it.

The trial court as the fact finder properly could find Gooden's testimony incredible. The evidence on which the Commonwealth relies, however, is insufficient to support his conviction of involuntary manslaughter. The victim was shot as he looked into thickets where he thought he heard a deer. His companion, Sipe, heard two or three shots before and two after Wyant shouted and fell

mortally wounded. Sipe saw no deer in the vicinity. In addition to the bullet from Gooden's .30-.30 Winchester rifle which killed Wyant, four shell casings from Gooden's .30-caliber carbine were found after the accident. The shell casings were located about 430 yards from the place where Wyant was shot. As the majority observe, the evidence indicates that a horizontal shot fired south from the location of the four shell casings would probably have hit the bank of a gulley. But Sipe testified that a bullet went past his ear after Wyant had fallen. The conclusion is compelling that the fatal shot was fired from a point near the shell casings. The evidence leaves unanswered, however, the question whether from this point Gooden in the exercise of due caution could or should have seen Wyant.

I do not agree that Sipe's testimony that he saw no deer nearby before or after the shooting eliminates the theory that Gooden may have fired inaccurately at a deer and struck Wyant. Nor do I think Commonwealth's evidence shows that Gooden did not in the exercise of due caution shoot a human mistaking him for a deer.

The majority find that Gooden "fired a weapon capable of inflicting serious bodily harm or death *directly at two persons* . . . ." (Emphasis added.) There is no direct evidence supporting this conclusion, and the finding cannot be justified by any reasonable or fair inference to which the Commonwealth is entitled.

No one can deny that this was a tragic accident. But Gooden was engaged in the lawful pursuit of a form of recreation sponsored by the Commonwealth. He was not required to insure the safety of all other hunters within the range of his weapons. The devotees of this sport are aware of a certain inherent risk of danger where high-powered weapons may lawfully be used. To convict Gooden of manslaughter, under the most favorable view of the evidence, is in effect to impose a rule of strict liability. We have not approved such a rule in civil litigation and we are not justified in applying it in a criminal prosecution. Although the evidence is sufficient to establish ordinary negligence, I do not agree that it is sufficient to establish criminal negligence. Therefore, I would reverse the judgment of the trial court.

CARRICO, C.J., and STEPHENSON, J., join in the dissent.