COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Powell and Alston
Argued at Richmond, Virginia


TRACIE DOWELL NININGER

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0450-09-3                      JUDGE CLEO E. POWELL
                                                         MAY 4, 2010
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF ROANOKE COUNTY
                         James R. Swanson, Judge

            Mark J. Yeager (Law Offices of Yeager & Thelin, on briefs), for
            appellant.

            Josephine F. Whalen, Assistant Attorney General (Kenneth T.
            Cuccinelli, II, Attorney General, on brief), for appellee.


        Tracie Dowell Nininger ("Nininger") appeals her conviction for aggravated involuntary

manslaughter, in violation of Code § 18.2-36.1(B).  Nininger argues that there was no causal

connection between her intoxication and the victim's death as required under Code

§ 18.2-36.1(A).  In the alternative, Nininger contends that the evidence was insufficient to prove

that her conduct "was so gross, wanton and culpable as to show a reckless disregard for human

life," as required under Code § 18.2-36.1(B).

                                    BACKGROUND

        On the evening of February 19, 2008, Nininger met friends for dinner at a restaurant in

Roanoke, Virginia, where she had two glasses of wine with her meal.  At about 8:30 p.m., she

left the restaurant and met another friend at a different restaurant in Roanoke, where she had

another two glasses of wine.  She left the second restaurant around 9:30 p.m.

_____
* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Nininger next went to Cornerstone Bar and Grill, where she met up with Jeffrey Scott Dupree ("Dupree"). While there, Nininger had another glass of wine. Additionally, both Dupree and Nininger consumed at least one "shooter." By 12:00 a.m., February 20, 2008, Nininger and Dupree were noticeably intoxicated. At one point, Nininger lost her balance and fell to the floor, dragging Dupree down with her. Based on this behavior, the manager of Cornerstone asked them to leave. Nininger and Dupree subsequently gathered their belongings, paid their bills, and left the establishment. Nininger proceeded to her 2006 Hummer H3 and drove off with Dupree following her in his 2008 Chevy Avalanche.

Meanwhile, that same night Draper Paving Company was repaving a trench on the right side of Electric Road located on the outskirts of Roanoke. The repaving required the closure of the right lane of Electric Road, a four lane divided highway. To facilitate the closure, a diagonal line of cones was placed in the road to channel drivers from two lanes of traffic down to only the left lane. When the diagonal line of cones had completely blocked the right lane, the line straightened and followed the center stripes up to and beyond the construction zone.

Richard Slone ("Slone"), was operating his dump truck within the construction zone. Slone's dump truck, which was carrying asphalt, was parked parallel to the traffic lane within the closed right lane. A backhoe, operated by James Harmon ("Harmon"), was positioned behind the dump truck, also facing forward. On its front end was a large bucket; on the rear, affixed to a hydraulic arm, was a scraping blade that was approximately seven feet wide. The blade, which was not in use, was raised up approximately three feet off the ground.

When more asphalt was needed to fill an area of the trench, Slone would dump it into the bucket of the backhoe. Harmon would then maneuver the backhoe perpendicular to the dump truck so that the bucket was over the open trench, and drop the asphalt in. In performing that maneuver, Harmon would necessarily have to back the backhoe up and move into the open left

lane.  As the backhoe was 21 feet long, even when the bucket was over the trench, the blade would hang into the open left lane.[1]  For safety reasons, a flagman would stop traffic in the left lane whenever the maneuver was being performed.[2]

At approximately 12:30 a.m., more asphalt was needed for the trench.  However, Earl Murray, who had been working as the flagman that night, had traveled back to the Draper Paving Company headquarters to get some supplies.  As a result, Robert Hawks ("Hawks"), moved into position to act as flagman.  Hawks stood on the dotted line between the right and left lanes, facing oncoming traffic approximately 60 feet from the rear of the backhoe.  At the time he was wearing a reflective vest and carrying a large stop sign.

After filling the bucket of the backhoe, Harmon began to maneuver the backhoe into position to dump the asphalt into the trench.  At some point, Slone got out of the dump truck and was standing near its rear tires.  When Harmon had finished backing up and was moving forward, Hawks noticed two vehicles, driven by Nininger and Dupree, approaching the construction site.  Hawks attempted to stop the vehicles, however he quickly realized that neither vehicle was slowing down.  As the vehicles passed Hawks, he noted that Dupree's Chevy Avalanche was only one or two car lengths behind Nininger's Hummer H3.

Hawks watched as Nininger collided with the blade of the backhoe and then Dupree collided with Nininger.  The combined force of the two impacts caused the backhoe to rotate

---

[1] It is unclear from the record how far the backhoe encroached into the left lane.  The trial court determined that, at the time of the accident, the blade hung between 2.4 and 3.2 feet into the open left lane.

[2] The evidence demonstrates that, on the night of the accident, the flagman carried a large sign reading "stop" on one side and "slow" on the other to halt traffic.  As counsel pointed out at trial, this was a violation of VDOT regulations, as the regulations mandate that, at night, a flagman must also be illuminated.

clockwise, driving the blade of the backhoe into Slone, pinning him against the dump truck and virtually ripping him in half.

At the time of the collision, Officer Sean Chuyka of the Roanoke County Police Department was on patrol nearby. His window was down and he heard what sounded like a small explosion near Electric Road. He drove toward the sound to investigate. En route, he received a call from dispatch informing him of the crash.

As Officer Chuyka arrived on the scene, he noticed Hawks, stop sign still in his hand, running from the crash site toward a nearby intersection to stop traffic from entering the now blocked lane. Officer Chuyka parked his cruiser in the road to block traffic and went to the crash site to check for injuries. He found Dupree still in his vehicle and Nininger standing between the Avalanche and the Hummer. Officer Chuyka spoke to each of them and determined they were not injured.

While Officer Chuyka was speaking with Dupree and Nininger, one of the members of the Draper crew approached him and told him Slone had been badly injured. The crew member led Officer Chuyka to Slone, who was caught between the dump truck, the backhoe, and Nininger's Hummer. Slone was asking for help and starting to lose consciousness. Officer Chuyka immediately called dispatch, advised that someone was seriously hurt, and made sure an ambulance was en route. Slone later died as a result of his injuries.

Sergeant Pasco of the Roanoke County Police Department arrived at the crash scene shortly after Officer Chuyka. After speaking with another officer on the scene, Sergeant Pasco began to interview Nininger. Smelling alcohol on Nininger's breath, Sergeant Pasco asked another officer, Officer Shane Snowden, to "investigate the DUI."

Officer Snowden noticed Nininger smelled strongly of alcohol and that her eyes were bloodshot. Officer Snowden had Nininger perform several field sobriety tests. Nininger

- 4 -

performed poorly on these tests. Officer Snowden arrested Nininger for driving while intoxicated, advised her of her rights, and informed her of the implied consent law. Nininger agreed to provide a breath sample, which revealed that her blood alcohol content was .19%.

The subsequent investigation revealed that, according to the Hummer H3's event data recorder ("EDR"),[3] Nininger was traveling at 37 mph[4] and never attempted to brake or swerve to avoid the blade of the backhoe.

Nininger was charged with one count of driving under the influence, in violation of Code § 18.2-266, and one count of aggravated involuntary manslaughter, in violation of Code § 18.2-36.1(B). Nininger pled guilty to driving under the influence, and not guilty to aggravated involuntary manslaughter. Nininger elected to have a bench trial as opposed to a jury trial.

At trial, Dr. David Burrows, a forensic toxicologist, testified as an expert for the Commonwealth. Dr. Burrows explained that, at a BAC of .15, a person's balance, reaction time, and critical judgment are affected.

Dr. Christina Roberts, the medical examiner, testified that Slone suffered "extensive traumatic injuries to the lower part of his torso." Dr. Roberts explained that these injuries resulted in "lacerations . . . of the femoral arteries and veins and all of the small arteries and veins within the pelvis and the trunk." Dr. Roberts further explained that, due to the massive, traumatic blood loss, the injury was fatal, but the combined pressure of the blade of the backhoe and the dump truck temporarily slowed the flow of blood from Slone's body. As a result, Slone was still conscious and asking for help when police first arrived at the scene of the accident minutes later.

---

[3] Officer Christian explained that he accessed the EDR in each vehicle using a Crash Data Retrieval System connected to the diagnostic port of the vehicle.

[4] The speed limit within the construction zone was 35 mph.

In finding Nininger guilty of aggravated involuntary manslaughter, the trial court explained:

> As to the gross, wanton, and culpable component of the Commonwealth's case, I conclude from the evidence that both Defendants Nininger and Dupree were significantly impaired by their alcohol consumption prior to the accident . . . .
>
> \* \* \* \* \* \* \*
>
> I'm satisfied that the lane, the through lane, the tapering of the through lane -- was accomplished sufficiently ahead of where the construction work was being done that would have permitted a driver of a vehicle, with its headlights operational in that lane, to have seen an obstruction caused by the two or three foot portion of the tractor in this case that went over into the left-hand lane, to have, for a driver who was vigilant, unimpaired, keeping a proper lookout, to have made that observation and adjusted -- made the adjustments to her driving that the law required in light of what she would have observed.
>
> As a result, I conclude that in failing to see this piece of equipment partially in her lane of travel, when the circumstances were sufficient in my judgment to have enabled a reasonable, unimpaired person to make that observation, in this particular case, constituted a failure to keep a lookout, which is the duty the law imposes on any driver. This failure to . . . keep a proper lookout in the conduct of her vehicle in my view was also exacerbated by the extent of Mrs. Nininger's intoxication.

Nininger appeals.

## ANALYSIS

When considering the sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the Commonwealth, the prevailing party at trial. Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003) (citation omitted). On review, an appellate court should not substitute its judgment for that of the trier of fact. Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992).

A court considering a challenge to the sufficiency of the evidence does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."

Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (citation omitted). Rather, the relevant question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. This understanding of the standard of review recognizes the responsibility of the trier of fact to weigh the evidence and resolve conflicting testimony. Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (en banc).

Causation

Nininger initially argues that the Commonwealth failed to prove a causal connection between her intoxication and Slone's death. Nininger contends that any reasonable and prudent driver, faced with the same road conditions, could have collided with the blade of the backhoe. Therefore, according to Nininger, "it requires sheer speculation to rule that, but for alcohol, a reasonable driver could have seen the danger and reacted in time to take evasive action." We disagree.

"[A] conviction under Code § 18.2-36.1(A) 'requires proof that the accused was driving under the influence and that a causal connection exists between the driver's intoxication and the death of another person.'" Wyatt v. Commonwealth, 47 Va. App. 411, 417, 624 S.E.2d 118, 121 (2006) (quoting Goodman v. Commonwealth, 37 Va. App. 374, 386-87, 558 S.E.2d 555, 563 (2002)). "There can be more than one proximate cause [of an incident] and liability attaches to each person whose negligent act results in the victim's injury or death." Gallimore v. Commonwealth, 246 Va. 441, 447, 436 S.E.2d 421, 425 (1993) (citing Maroulis v. Elliott, 207 Va. 503, 510, 151 S.E.2d 339, 344 (1966)).

In the present case, the trial court specifically found that the accident was caused in large part by Nininger's intoxication. Specifically, the trial court found that Nininger's failure to keep a proper lookout was "exacerbated by the extent of [her] intoxication." In making this decision,

the trial court noted that an unimpaired driver, driving a vehicle with operational headlights, would have noticed the backhoe partially in her lane of travel and "made the adjustments to her driving that the law required in light of what she would have observed."

The impact of the alcohol on Nininger's behavior is amply supported by the evidence. The evidence proved that Nininger fell and was asked to leave the Cornerstone Bar and Grill before driving to the construction site. After the accident, she smelled strongly of alcohol and was unaware of her surroundings. She performed poorly on the field sobriety tests and had a BAC of .19. This behavior, coupled with Dr. Burrows' testimony that, at a .19 BAC, a person's vision, decision making, and reaction time would be adversely affected, was sufficient to connect Nininger's inattention and lack of reaction with her "'impaired perception, retarded reflexes, and disrupted motor coordination.'" Pollard v. Commonwealth, 20 Va. App. 94, 99, 455 S.E.2d 283, 286 (1995) (quoting Beck v. Commonwealth, 216 Va. 1, 5, 216 S.E.2d 8, 10 (1975)); Goodman v. Commonwealth, 37 Va. App. 374, 388-89, 558 S.E.2d 555, 563-64 (2002). It is clear from the record that Nininger's intoxication caused her to operate her vehicle in an unsafe manner. Her failure to keep a proper lookout and failure to brake or take any evasive action resulted in Slone's death. As such, we hold that there was sufficient evidence for the trial court to conclude that Nininger's intoxication caused the accident and Slone's subsequent death.

### Aggravation

Nininger next argues that, because her failure to keep a proper lookout is part of the causation element of the crime, it cannot also be used as an aggravating factor. Nininger contends that her conduct was not "conduct over and above the drunk driving conduct" referred to in Code § 18.2-36.1(A), and therefore she cannot be convicted under Code § 18.2-36.1(B). Again, we disagree.

- 8 -

We begin by noting that this Court has previously held that,

> in determining whether the evidence was sufficient to convict
> appellant under Code § 18.2-36.1(B), we may consider both
> (1) cases defining the parameters of the term, "criminal
> negligence," and (2) cases involving the sufficiency of the
> evidence to prove the criminal negligence required for a common
> law involuntary manslaughter conviction.

Wyatt, 47 Va. App. at 417, 624 S.E.2d at 121.

Thus, in order to convict under Code § 18.2-36.1(B), the Commonwealth must prove that Nininger's "drinking and driving behavior was accompanied by criminal negligence." Id. at 418, 624 S.E.2d at 122. However, "[t]he mere happening of an accident, coupled with evidence that the offender had been drinking and that the accident was his fault, does not prove criminal negligence as a matter of law." Id.

It is well established that, to prove criminal negligence, the Commonwealth must prove that

> the conduct of the driver constitutes a great departure from that of
> a reasonable person (gross, wanton or willful conduct) which
> creates a great risk of injury to others and where by the application
> of an objective standard the accused should have realized the risk
> created by his conduct.

Keech v. Commonwealth, 9 Va. App. 272, 280, 386 S.E.2d 813, 817 (1989).

Furthermore:

> Drunken driving . . . tends to make the defendant's dangerous
> conduct more dangerous. A sober but reckless driver may rely on
> his skill and prompt reflexes to extricate himself from any
> emergency created by his reckless driving. A drunken driver has
> dulled his perceptions, blunted his skill, and slowed his reflexes in
> advance. The same reckless driving is more dangerous at his
> hands than it would be if he were sober, and his conduct is
> therefore more culpable. Intoxication, therefore, is relevant as an
> aggravating factor, increasing with its degree, bearing upon the
> relative culpability of the defendant's conduct . . . .

Essex v. Commonwealth, 228 Va. 273, 283, 322 S.E.2d 216, 221 (1984).

Thus, a person's level of intoxication is "relevant to a determination of the degree of the defendant's negligence: whether ordinary, gross, or wanton." Id. at 283, 322 S.E.2d at 221-22. "It may serve to elevate the defendant's conduct to the level of 'negligence so gross, wanton, and culpable as to show a reckless disregard of human life.'" Id. at 283, 322 S.E.2d at 222 (quoting King v. Commonwealth, 217 Va. 601, 607, 231 S.E.2d 312, 316 (1977)); see also Stevens v. Commonwealth, 272 Va. 481, 488, 634 S.E.2d 305, 310 (2006) (holding that a defendant's high level of intoxication alone justified a finding that his conduct was gross, wanton, and culpable).

In the present case, there is ample evidence that Nininger was extremely intoxicated. However, the record clearly demonstrates that, in determining whether Nininger's conduct was gross, wanton, and culpable, the trial court did not rely solely upon the certificate of analysis showing that Nininger's BAC was .19.[5] Rather, the trial court determined that Nininger's failure to keep a proper lookout was "exacerbated by the extent of [her] intoxication."

It is clear from the record that, while driving through a well-marked and illuminated construction zone, Nininger failed to notice the yellow backhoe that had encroached two or three feet into her lane. As a result, she failed to make any attempt to brake prior to the impact. Additionally, although the remainder of the left lane was open and Nininger would have only had to deviate at most three feet to avoid the backhoe, she failed to swerve or take any evasive action.

Furthermore, there is ample evidence demonstrating that Nininger was so intoxicated that she was unaware of the seriousness of the accident. The recording of Dupree's 911 call reveals that Nininger was unaware that the accident completely blocked the through lane. The same

---

[5] We make no decision as to whether a BAC level of .19 alone would be sufficient to support a finding of negligence so gross, wanton, and culpable as to show a reckless disregard of human life. See Stevens, 272 Va. at 488, 634 S.E.2d at 310 (holding that a BAC of .24 or .25 justifies a finding of gross, wanton, and culpable conduct). We note, however, that the General Assembly has determined, at least in civil cases, that a BAC of .15 alone is "sufficiently willful or wanton as to show a conscious disregard for the rights of others." Code § 8.01-44.5.

- 10 -

recording also demonstrates that Nininger was more worried about the damage to her car than she was about Slone's injuries. On the recording, Nininger is overheard stating "My car is demolished." This is despite the fact that Slone was wedged between the backhoe and her damaged car and she told Officer Snowden that she heard Slone scream "as soon as she hit [him]." Thus, when taken as a whole, the evidence was sufficient to find that Nininger's failure to keep a proper lookout when combined with a high level of intoxication, was gross, wanton, and culpable conduct.

CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

<u>Affirmed.</u>