COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Beales, Athey and Callins
Argued at Arlington, Virginia

BRYAN EDELSTEIN

OPINION BY
v.        Record No. 1977-23-4                    JUDGE RANDOLPH A. BEALES
JANUARY 14, 2025
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Michael E. Levy, Judge

Julia B. Dillon (Goodall, Carper & Dillon, PLLC, on briefs), for
appellant.

Katherine Quinlan Adelfio, Senior Assistant Attorney General
(Jason S. Miyares, Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Stafford County convicted Bryan Edelstein of

one felony count of unlawfully discharging a firearm at or into an occupied dwelling or building,

in violation of Code § 18.2-279, and one misdemeanor count of reckless handling of a firearm, in

violation of Code § 18.2-56.1.  On appeal, Edelstein challenges the sufficiency of the evidence to

sustain his convictions, arguing that there was no proof that he endangered the life or property of

any person when he fired his gun at the floor of his residence multiple times in the presence of

his significant other.

I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v.

Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

(2016)).  "This principle requires us to 'discard the evidence of the accused in conflict with that

of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

Deputy T.A. Vasquez of the Stafford County Sheriff's Office testified at Edelstein's jury trial that on June 17, 2022, around midnight, he was dispatched to the house that Edelstein shared with his significant other, Jessica Swatlowski. Deputy Vasquez recalled that when he encountered Edelstein outside his house, "[t]here was an odor of an alcoholic beverage coming from his person."[1] He noted that Edelstein "was sweating, he also had glassy bloodshot eyes, almost watery, if you will, and slurred speech while talking to him, just not clear, almost like he was mumbling." When Deputy Vasquez asked Edelstein whether he had consumed any alcohol that evening, Edelstein "stated he took a drink from the bottle."

During his ensuing investigation in Edelstein's bedroom, Deputy Vasquez noticed that "[t]here were holes that were consistent with bullets that had been shot" into the wood floor. He observed that "[t]here was a grouping of maybe seven-ish, and then there was I would say three or four that were kind of spread out sporadically in the same area." He clarified that the term "grouping" refers to "multiple holes in that one area," and he explained that "[t]he smaller the grouping, the more accurate and precise" the shots. Deputy Vasquez also noticed that "there was a round in the hall, as well as two rounds outside."

Deputy Vasquez testified that, when he confronted Edelstein about the bullet holes in the floor, Edelstein stated that he and Swatlowski had been arguing that evening. Edelstein told Deputy Vasquez that, after arguing with Swatlowski but "before going outside to the garage to go to sleep, to basically separate, he had grabbed his gun and then fired off multiple rounds there

---

[1] Edelstein was also charged with public intoxication, but he was found not guilty of that offense in the Stafford County General District Court.

in the bedroom there where I was able to see that grouping as previously stated."[2]  Edelstein also told Deputy Vasquez that Swatlowski was in the same bedroom where he fired the shots. Swatlowski confirmed to Deputy Vasquez that she and Edelstein had "argued, and then he [Edelstein] grabbed the gun."  She told Deputy Vasquez that, immediately following the argument and the shooting, "she had to go into the bathroom, which was just on the other side of that—or just outside the bedroom door, to help calm her anxiety from what had just unfolded." Deputy Vasquez later "proffered the investigation" to a magistrate with Edelstein present, and, when "[a]sked if he [Edelstein] had anything to say," Edelstein's "statement was, everything that he [Deputy Vasquez] said is true."

Deputy C. Sterne of the Stafford County Sheriff's Office testified that he also responded to Edelstein's residence on June 17, 2022.  He recalled, "When I entered the bedroom there were several bullet holes in the floor."  He noted that there were "[a]pproximately ten or eleven" bullet holes and that "[m]ost of them were pretty concentrated."  Deputy Stern then went into the basement, where he saw that "there was an HVAC sheet metal type duct, there were several bullet holes in the sheet metal, it appeared to be coming down through it."  He also observed that "on the floor there was . . . two impacts from rounds that had came through the floor."  He pointed out that the concrete floor looked "like a piece of the concrete had been chipped or just something hard had hit it."  Deputy Stern found two rounds on the floor, but he did not find any casings, and he did not see any damage in the bedroom other than the bullet holes in the floor.

Captain Joe Bice of the Stafford County Sheriff's Office testified "as an expert in firearms and firearms safety."  He explained that "once the projectile leaves the barrel it's

---

[2] Without objection from Edelstein's trial counsel, the Commonwealth introduced into evidence the semiautomatic firearm that Deputy Vasquez collected from "the garage area" of Edelstein's house.  Deputy Vasquez noted that he found the firearm in the same location that Edelstein said it would be.  Deputy Vasquez stated that in Edelstein's firearm, "[t]here was a magazine inserted with four rounds in said magazine, as well as one in the chamber."

spinning," so "when it hits something it can fragment." He noted that the projectile "can splinter" the floor, "and then it can ricochet depending on the angle that it strikes and the hardness of the floor." Captain Bice also explained that the composition of the projectile, the angle in which the projectile hits the floor, and the flooring material can all impact how the projectile could fragment, splinter, or ricochet after being fired from a gun into the floor. Addressing the potential impact of a bullet fired into a wooden floor, Captain Bice opined, "I would expect if a firearm is shot into wood that there would be splintering and pieces of wood would be . . . moved around in the room." He emphasized that bullet fragments "could hit a person," stating, "If you're in a small space, . . . I would be concerned about pieces of the bullet coming apart." Captain Bice acknowledged that in this case, however, it was unlikely that any ricochets occurred if the only observed damage was to the bedroom floor — but he could not render a conclusion with any certainty.

At the conclusion of the Commonwealth's case-in-chief, Edelstein's trial counsel moved to strike both charges, arguing that "there's nothing showing any type of endangerment . . . to life, limb or property, or endangering the life or lives of other people." Edelstein's trial counsel asserted that "the Commonwealth's case is really just that there's a remote possibility of some possible endangerment," and she maintained that "I don't think there's even sufficient evidence to show that she [Swatlowski] could get a splinter in this case." The trial court denied the motion to strike, finding that "the concept of the ricochet, hitting something, or pulling a round apart and sending fragments would at this juncture satisfy the element of endangerment."

Swatlowski testified in Edelstein's defense that she has been in a romantic relationship with Edelstein "going on five years" and that she has resided with him for "[a] little over a year, almost a year-and-a-half." She stated that she and her seven-year-old daughter live in the house with Edelstein, but that her daughter was not home on the night of the shooting incident. When

asked to describe the firearms-related activities that she and Edelstein engage in, Swatlowski testified that they "would go unwind in the backyard and shoot together" as a "kind of bonding thing for us." She noted that Edelstein owned "a black Glock" that he kept "on magnets for home security" near the bed in their bedroom.

Swatlowski further testified that on the night of the shooting incident, she returned home from dinner and began arguing with Edelstein about an "infidelity that had occurred and the emotion behind that. It was very emotional." She explained that after arguing "for a long time," she and Edelstein "decided that we were going to separate since it was no longer a productive conversation and we would cool off and revisit once we cooled off." She recalled that she "was sitting on the bed across the room by—behind him diagonally" when Edelstein grabbed his firearm and fired his gun downward as he stood "[n]ear the door of the room." She also recounted, "I saw him pause, and then I determined after he fired that he paused because he didn't want to hit the HVAC unit and he moved to a different spot and he fired into the empty basement."

Swatlowski stated that her initial reaction to the shots was "[t]o close my eyes because I was annoyed that now we had to replace the floor a little bit sooner than planned." Although she went into the bathroom after the shooting, she claimed that she "wasn't scared" and that she was not feeling anxious. In addition, she maintained that Edelstein "was not upset" following their argument, although "[h]e appeared tired." She also maintained that Edelstein "did not shoot again" that evening and that he did not point the gun at her. Furthermore, Swatlowski claimed that Edelstein "had not at that point" consumed any alcohol and that she did not observe any signs of intoxication.

Edelstein then testified in his own defense that he had been around firearms since he "was seven or eight" years old and that he had previously viewed firearm safety videos, although

he had no professional training on gun safety. He recounted that, following his argument with Swatlowski, he began gathering items to take with him to the garage—including his firearm that was stored near where Swatlowski was sitting on the bed. When asked to describe what happened after he grabbed his firearm, Edelstein stated:

> So how—so I have a shelf beside my bed, there's two diagonal magnets, and the gun sits catty-corner towards the wall. So as I'm sleeping, I can just roll over with my dominate [sic] hand, roll over and put it on target at the doorway if someone is coming in. So it's facing the wall. So basically when I grab it, wall is here, Jesse [Swatlowski] is on this side of me, so when I grab it, I always put it straight down at the ground, and then I kind of scoot off the bed, and then instantly I was like, I want to shoot, and then I was like, well, I'm going to hit the HVAC machine. So I walk roughly probably six feet or so, I was like I'll clear all the main—the pieces of the HVAC machine. So I'm over here, and then as I was coming to the stop, that's when I took the first shot, came to a stop, and then that's where the small cluster is.

Characterizing shooting as a form of "stress relief" for him, Edelstein then described the actions he took after firing his gun "roughly ten or eleven" times into the bedroom floor:

> Then after that—so from the immediate shots, instant, what did I do. So I dropped the mag, grabbed the mag, cleared the chamber, throw the magazine back in. I think I just dropped the bullet. We found it later in our laundry heap or something, so—and then from there I tossed the gun out of the room before I looked at Jesse [Swatlowski]. So the mark in the hallway, it hit the floor and then it—actually, you can see where it bounced up into the drywall and the back imprint of the gun is in the drywall. It was not an actual bullet hole. But after clearing the gun, removing the gun, turned around to Jesse [Swatlowski] and basically said, I don't know the exact words, but it was, I'm sorry, I shouldn't have done that, and then I left the situation.

Edelstein acknowledged that when he was with Deputy Vasquez before the magistrate, he had agreed with Deputy Vasquez's depiction of events, but he maintained that he only fired his gun into the bedroom floor and not down the hallway. He also acknowledged during his testimony that he "took a big ole swig of vodka" before the police arrived at his home, but he maintained that he had not consumed any alcohol prior to shooting his firearm. Edelstein claimed that

although the reason he shot into the bedroom floor was partly due to his argument with Swatlowski, it was mostly due to work-related stress.

After presenting the defense's evidence, Edelstein's trial counsel renewed the motion to strike "for the same reasons that were already stated." His trial counsel argued that the Commonwealth's evidence did not show "any type of endangerment to the life or lives of any other such person, or that there was anything about the reckless handling or the endangerment of life, limb or property of another, just the property of his own home." The trial court denied Edelstein's renewed motion to strike, finding that "[i]t's a fact issue for you both to argue to the jury and the jury to then decide." After hearing argument and the evidence, the jury subsequently found Edelstein guilty of both charged offenses. Edelstein's trial counsel later moved the trial court to set aside the jury's verdict, which the trial court denied. Edelstein now appeals to this Court.

## II. ANALYSIS

### A. Standard of Review

The Supreme Court has often stated, "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id*. (alteration in original) (emphasis in original) (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (emphasis in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidence to support

- 7 -

the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." *Clark v. Commonwealth*, 279 Va. 636, 641 (2010) (quoting *Commonwealth v. Jenkins*, 255 Va. 516, 520 (1998)).

B. <u>Unlawfully Discharging a Firearm at or into an Occupied Dwelling or Building</u>

On appeal, Edelstein argues:

> The Trial Court Erred in finding that the evidence was sufficient to find Appellant guilty of the felony unlawfully discharging a firearm within an occupied building pursuant to Va. Code § 18.2-279 when there was no evidence that the firearm was discharged in a manner that would endanger the life or lives of the other person in the occupied structure when the other individual was not injured and not in fear of any injury based not only on the facts found by law enforcement of the shots going into the wooden floor without any evidence of anything that could cause a ricochet and because he knew where the other individual was and purposefully shot away from that individual to the wooden floorboard of his room in a location known to him to be unlikely to cause any harm to the other individual.

Code § 18.2-279 makes it a Class 6 felony for any person who unlawfully "discharges a firearm within any building when occupied by one or more persons in such a manner as to endanger the life or lives of such person or persons," or who unlawfully "shoots at, or . . . throws any missile at or against any dwelling house or other building when occupied by one or more persons, whereby the life or lives of any such person or persons may be put in peril." The Supreme Court has recognized that, for purposes of Code § 18.2-279, the term "unlawfully" describes "conduct that merely demonstrates 'criminal negligence.'" *Bryant v. Commonwealth*, 295 Va. 302, 310 (2018) (quoting *Gooden v. Commonwealth*, 226 Va. 565, 571 (1984)) (concluding that "the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to support the conviction [under Code § 18.2-279] without any proof of the defendant's intent when discharging the firearm"). A defendant's "criminal negligence," in turn,

- 8 -

"is judged under an objective standard and may be found to exist where the offender either knew or should have known the probable results of [his] acts." *Id.* (quoting *Riley v. Commonwealth*, 277 Va. 467, 483-84 (2009)). *See also Noakes v. Commonwealth*, 280 Va. 338, 346 (2010) (explaining that "criminal negligence" occurs "when acts of a wanton or willful character, committed or omitted, show 'a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable results of his acts'" (quoting *Brown v. Commonwealth*, 278 Va. 523, 528 (2009))).

It is well settled that "the legislative purpose" of Code § 18.2-279 "is meant to prohibit unlawful conduct, whether malicious or merely criminally reckless, which has the *potential* to endanger the lives of persons inside occupied buildings, without regard to the shooter's actual motive or intent in unlawfully discharging a firearm." *Ellis v. Commonwealth*, 281 Va. 499, 506 (2011) (emphasis added). *See also Taylor v. Commonwealth*, 77 Va. App. 149, 163 (2023) (explaining that "the essence, or gravamen, of an offense under Code § 18.2-279 is the risk of endangerment or death to another as a result of discharging a firearm"). Indeed, "this legislative determination relieves the Commonwealth of the burden of proving that human life was, in fact, endangered." *Dowdy v. Commonwealth*, 220 Va. 114, 117 (1979). Rather, the Commonwealth is required to show only that "the discharge of the firearm may have put [someone's] life in peril." *Kirby v. Commonwealth*, 264 Va. 440, 445 (2002) (rejecting the defendant's argument that he was not guilty of violating Code § 18.2-279 because his wife was not injured when he fired two shots from their bedroom while she sat approximately fifteen feet away in the living room). *See also Strickland v. Commonwealth*, 16 Va. App. 180, 182 (1993) (affirming the defendant's conviction under Code § 18.2-279 where the defendant fired a gun into the ceiling of the entry way of a hospital emergency room occupied by 75 people, as "[t]he possibility that the bullet

might have hit a metal part or solid object in the ceiling and ricocheted" sufficiently proved that the defendant shot the firearm in such a manner as to endanger the lives of the people present).

This Court has explained that the term "endanger" means to "expose to danger, harm, or loss." *Coleman v. Commonwealth*, 52 Va. App. 19, 24 (2008) (quoting *Webster's New World Dictionary* 448 (3d coll. ed. 1988)); *see also Endangerment, Black's Law Dictionary* (12th ed. 2024) (defining "endangerment" as "[t]he act or an instance of putting someone or something in danger; exposure to peril or harm"). "That the exposure to danger does not result in any actual harm is a welcome fortuity, but not a legal defense." *Coleman*, 52 Va. App. at 24 (addressing "endangerment" as applied to Code § 46.2-817(B)). There is no dispute in this case that, following a lengthy and emotional argument, Edelstein fired his firearm multiple times at the bedroom floor of his house while his significant other, Jessica Swatlowski, sat across the same room from him on the bed. There is also no dispute that no one was actually injured by the shots. However, the Commonwealth was not required to prove that anyone was actually injured by a stray shot or by a fragmenting or ricocheting bullet—only that Edelstein's actions *may have* put someone's life in peril. *See Kirby*, 264 Va. at 445. The dispositive issue here then is whether the life of any person in Edelstein's house could have been endangered or put in peril when Edelstein fired multiple shots at the bedroom floor.

The record before this Court on appeal contains ample evidence that Edelstein unlawfully fired his gun inside his house in a manner that endangered the life of his significant other, Swatlowski, who was sitting on the bed in close proximity to where he fired the shots. Swatlowski testified that after a prolonged and "very emotional" argument, Edelstein grabbed his firearm and fired it downward as he stood "[n]ear the door of the room." Edelstein likewise testified that he fired his gun "roughly ten or eleven" times in immediate succession into the bedroom floor while Swatlowski was in the same room and sitting nearby on the bed. Deputy

Vasquez recounted Edelstein's and Swatlowski's statements to him on the night of the shooting incident, which confirmed that Edelstein "had grabbed his gun and then fired off multiple rounds there in the bedroom." Deputy Vasquez also recalled that "[t]here were holes that were consistent with bullets that had been shot" into the wood floor, including "a grouping of maybe seven-ish" bullet holes. Deputy Stern similarly testified that he saw "[a]pproximately ten or eleven" bullet holes in the bedroom floor. Furthermore, Captain Bice emphasized his concern that bullet fragments "could hit a person," stating, "If you're in a small space, . . . I would be concerned about pieces of the bullet coming apart." As noted *supra*, the Commonwealth was not required to prove that Edelstein's firing of his gun resulted in a barrage of stray bullets; rather, the mere *possibility* of ricocheting bullets supported the jury's finding that Edelstein's discharge of his firearm within the confined area of the bedroom and near Swatlowski could have placed her life in peril. *See Kirby*, 264 Va. at 445. It was therefore reasonable for the jury to find that Edelstein's act of firing multiple shots in quick succession into the bedroom floor could have possibly resulted in a ricochet of stray bullets.

It is well established that "[t]he fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 518 (1998)). "The trier of fact is not required to accept a party's evidence in its entirety, *Barrett v. Commonwealth*, 231 Va. 102, 107 (1986), but is free to believe or disbelieve, in whole or in part, the testimony of any witness, *Rollston v. Commonwealth*, 11 Va. App. 535, 547 (1991)." *English v. Commonwealth*, 43 Va. App. 370, 371 (2004). Indeed, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Maust v. Commonwealth*, 77 Va. App. 687, 703 (2023) (alteration in

original) (quoting *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018)). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Id.* (alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011)).

Although the testimony offered by both Edelstein and Swatlowski was intended to establish that there was no endangerment of a person, the Commonwealth presented evidence that contradicted their respective testimony. In finding Edelstein guilty of the charged offenses, the jury clearly rejected the scenario advanced by Edelstein and Swatlowski and resolved all conflicts in their respective testimony in favor of the Commonwealth. In short, given that the jury's findings are supported by the record and are not plainly wrong, we certainly cannot say that no rational fact finder could have found that Edelstein discharged his firearm in an occupied dwelling in such a manner as to endanger the life of Swatlowski, who was present nearby in the same room.[3]

## C. Reckless Handling of a Firearm

Edelstein also argues:

> The Trial Court Erred in finding that the evidence was sufficient to find Appellant guilty of the misdemeanor reckless handling of a firearm pursuant to Va. Code §18.2-56.1(A) when there was no evidence that the firearm was being handled recklessly or that the

---

[3] To the extent that Edelstein relies on any distinction between the two sections of Code § 18.2-279—the first addressing shooting *within* an occupied building and requiring proof of endangerment, and the second addressing shooting *at* an occupied building and requiring proof that lives may have been put in peril—we must reject his argument that "endanger" and "put in peril" are dissimilar terms given the Supreme Court's binding interpretation of Code § 18.2-279 in *Kirby* and in *Dowdy*. *See generally Anderson v. Commonwealth*, 48 Va. App. 704, 712-13 (2006), *aff'd*, 274 Va. 469 (2007). In 1975, Code § 18.1-66—which proscribed "discharg[ing] a firearm within any [occupied] building . . . in such a manner as to endanger"—was recodified as Code § 18.2-279. Language from Code § 18.1-152—which proscribed shooting at or into any occupied dwelling "whereby the life of any [person] in the building may be in peril"—was included in the new Code § 18.2-279. *See* 1975 Va. Acts chs. 14, 15; *see also Jones v. Commonwealth*, 68 Va. App. 304, 308 n.3 (2017). In this case, the indictment charged that Edelstein, "[o]n or about June 17, 2022, in the County of Stafford, did unlawfully shoot at or into a dwelling or building then occupied by one or more persons in such manner as to endanger the lives of such person or persons," in violation of Code § 18.2-279.

handling endangered the life, limb, or property of any person when the only damage found was to Appellant's own floorboard.

He "incorporates by reference" the argument that he made on the element of endangerment as it pertained to Code § 18.2-279.

Code § 18.2-56.1(A) provides, "It shall be unlawful for any person to handle recklessly any firearm so as to endanger the life, limb, or property of any person. Any person violating this section shall be guilty of a Class 1 misdemeanor." "The manifest purpose of Code § 18.2-56.1(A) is to prevent actual endangerment, not the mere appearance of endangerment." *Jones v. Commonwealth*, 65 Va. App. 274, 278 (2015). As this Court has explained, the reckless handling of a firearm is not limited to a handling "so gross, wanton or culpable as to show a reckless disregard of human life." *Darnell v. Commonwealth*, 6 Va. App. 485, 492 (1988) (quoting *King v. Commonwealth*, 217 Va. 601, 607 (1977)). However, "it must be more than that necessary for ordinary negligence." *Mangano v. Commonwealth*, 44 Va. App. 210, 217 (2004) (noting that "[t]he culpable conduct necessary for reckless conduct falls between the criminal negligence necessary for involuntary manslaughter and ordinary negligence"). It follows that "reckless conduct requires an awareness that serious injury will likely result." *Id.* (citing *Barrett v. Commonwealth*, 268 Va. 170, 183 (2004)). However, a defendant "need not have actually discharged a firearm at a person or at property in order for him to be convicted under the statute." *Luck v. Commonwealth*, 30 Va. App. 36, 45 (1999).

In this case, the jury was entitled to reject Swatlowski's testimony and reasonably to infer that she was actually endangered when Edelstein fired his firearm multiple times in close proximity within their bedroom. *See, e.g.*, *English*, 43 Va. App. at 371. Although Swatlowski testified that she "wasn't scared" and that she was not feeling anxious following the shooting incident, Deputy Vasquez testified that Swatlowski told him that "she had to go into the bathroom, which was just on the other side of that—or just outside the bedroom door, to help calm her anxiety from what

had just unfolded." Furthermore, although Swatlowski testified that Edelstein "was not upset" following their argument and that she and Edelstein "decided that we were going to separate since it was no longer a productive conversation and we would cool off and revisit once we cooled off," Edelstein testified that after grabbing his firearm, "instantly I was like, I want to shoot," which he described as a form of "stress relief." Therefore, the mere fact that Swatlowski maintained that she was not afraid when Edelstein fired his gun multiple times at the bedroom floor while she sat on the bed across the room from him did not mean that her life or limb was not actually endangered by his handling of his firearm.

In addition, the jury was entitled to disbelieve Edelstein's self-serving testimony that he exercised caution when he fired the "roughly ten or eleven" shots into the bedroom floor by being aware of Swatlowski's location and by focusing on a specific area of the floor. *See, e.g.*, *Maust*, 77 Va. App. at 703. By his own admission, Edelstein was not a stranger to firearms—as he had been around firearms since he "was seven or eight" years old. Indeed, Deputy Vasquez observed that "[t]here was a grouping of maybe seven-ish" bullet holes in the bedroom floor, but he also noted that there were "three or four that were kind of spread out sporadically in the same area," thereby showing a lack of control by Edelstein. Contrary to Edelstein's testimony that he did not fire his gun in the hallway or outside the house, Deputy Vasquez also observed that "there was a round in the hall, as well as two rounds outside," which further suggested a lack of control by Edelstein.

Finally, although Swatlowski and Edelstein denied that Edelstein had consumed alcohol before the shooting incident and denied that he was intoxicated, Deputy Vasquez testified that when he encountered Edelstein outside his house, "[t]here was an odor of an alcoholic beverage coming from his person," and he "was sweating, he also had glassy bloodshot eyes, almost watery, if you will, and slurred speech while talking to him, just not clear, almost like he was

- 14 -

mumbling." Thus, the jury could discredit the testimony of Swatlowski and Edelstein that Edelstein had not consumed any alcohol before he fired multiple shots at the bedroom floor. The record before this Court on appeal shows that the officers arrived at the house within minutes of the call to the police about all the shots, so very little time elapsed between the shooting and their arrival. The jury could therefore implicitly find that Edelstein would not become that intoxicated that quickly if he had only consumed alcohol after he had finished shooting.

In short, viewing these facts in the light most favorable to the Commonwealth and with all credibility issues resolved by the jury, we certainly cannot say that no rational fact finder could have found that Edelstein's handling of his firearm was reckless.

### III. CONCLUSION

Based on the totality of the circumstances in the record before this Court on appeal, the jury reasonably concluded that Edelstein recklessly handled his firearm and that he could have endangered the life of his significant other, Jessica Swatlowski, when, after a heated argument with her, he fired many shots into the bedroom floor while she sat nearby on their bed. In addition, the trial court was not plainly wrong in concluding that Edelstein's discharge of his firearm may have placed Swatlowski's life in peril and that his handling of his firearm was also reckless. For all of these reasons, we certainly cannot say that no rational finder of fact could conclude beyond a reasonable doubt that the evidence was sufficient to support Edelstein's convictions for unlawfully shooting at or into an occupied dwelling and for reckless handling of a firearm. Therefore, we do not disturb the trial court's judgment, and we uphold Edelstein's convictions.

*Affirmed.*